Whaley, Chief Justice,
delivered the opinion of the court:
Plaintiff brings this suit for the purpose of recovering on :a contract with the Post Office Department for the carriage of ocean mail.
Plaintiff is the successor of three other corporations, the .assets of which were taken over by it. All these corporations were organized for the purpose of developing the seagoing vessels which would carry railroad cars on ocean routes, thereby avoiding the necessity of loading and unloading at the several ports of call.
In 1929, the President of the United States created a Committee composed of the Secretary of Commerce, the Postmaster General, the Chairman of the Shipping Board and the Secretary of the Navy to solve the problems arising out of the “Merchant Marine Act, 1928”, 45 Stat. 692, 698, in relation to contracts which might be let over a period of ten years for the carriage of ocean mails. This committee was authorized to appoint a subcommittee of experts from various departments to assemble material for the committee.
The committee met and designated itself as the “Interdepartmental Ocean Mail Contract Committee” and appointed a subcommittee which designated itself as the “Interdepartmental Subcommittee of the President’s Committee on Ocean Mail Contracts.”
On September 12,1929, Graham M. Brush, who was president and an active mover in the Over-Seas Railways Corporation, one of the predecessors of plaintiff, consulted with the officials of the Navy Department and, after such con *309 sultation, formally applied to tbe chairman of the Subcommittee for an ocean mail contract. In this application it was proposed to use a vessel, which was built in English shipyards, after having it transferred to American registry, and to have additional vessels of the same type and size constructed in American shipyards. On the same day Brush submitted blueprints of the general arrangement of this type of vessel to the Secretary of the Navy with an inquiry as to its value as a naval auxiliary in time of national emergency.
On October 17, 1929, the acting Secretary of the Navy replied to this inquiry stating that “the peculiar construction of the vessel would be of particular value to the Navy, as regards ease of conversion, for use as an aircraft carrier,” and that the “design is also well adapted to conversion to several types of auxiliary vessels which the Navy would require.” Merchant Marine Act, Sec. 405, 406, supra.
Brush also submitted his plans to the Subcommittee in February 1930 and the information presented by him was carried in the New York Times, the Journal of Commerce, and the United States Daily the following day. The Subcommittee appointed an examiner who went into the details of the Over-Seas’ proposal for an ocean mail contract from New Orleans to Havana and made a favorable report concluding “that the proposals of the Over-Seas Railways, Inc., are sound and their service has the best outlook toward permanency.” The Subcommittee recommended to the Interdepartmental Committee, which was composed of three Cabinet members and the Chairman of the Shipping Board, that the contract be advertised.
Negotiations were carried on and various meetings held, and on January 31, 1931, Brush proposed two new vessels and altered his plans and designs of these vessels to conform to the specifications of the Navy Department. Further examinations were made by the Subcommittee and a favorable report was made to the Interdepartmental Committee, including in the report as follows:
It was moved and carried to recommend favorable consideration of the Over-Seas Railways, Inc., proposal, as amended under date of January 31, for the certification of a mail contract route from New Orleans *310 to Havana. The proposal contemplates the building of two new vessels capable of carrying loaded railway equipment. The. first to be built within two and the second within four years from the award of a mail contract. The number of sailings proposed is fifty sailings per year for the first two years and one hundred sailings per year thereafter.
In reference to the use of the ship which was built in England, the committee reported as follows
The question of eligibility of the steamer Seatrain was referred to the Post Office Department solicitor, who confirmed the position of the applicant that the . Seatrain could be made eligible for mail contract service by transferring it to American registry.
Nothing was done in this matter, owing to the national economy situation, until June 1931 when Brush wrote to the Postmaster General making application for an ocean mail contract and agreeing to construct two new vessels immediately upon the granting of the mail contract and to put them in operation not later than eighteen months thereafter. The Interdepartmental Committee in July 1931 approved 'this application and recommended the advertising of an ocean mail contract as suggested by the Over-Seas Railways corporation.
On July 29, 1931, the Postmaster General notified the • Chairman of the Shipping Board that he had, under section 402, as amended, of the Merchant Marine Act of 1928, supra, 'certified to the United States Shipping Board, an ocean mail ■route from New Orleans to Havana, and in this notice was set out at least fifty trips a year with an increase to not more ■than one hundred trips aftér the second year. In August 1931 the Shipping Board certified to the Postmaster General a mail route from New Orleans to Havana setting out ■the type of vessel to be used at the commencement of the service and the replacement by vessels of a certain type. Both types mentioned by the Shipping Board required vessels carrying not less than ninety railroad cars. Merchant Marine Act, supra, Sec. 403. The press published generally ■the fact of this certification throughout the country.
' On August 11,1931, application was made to the Shipping Board for construction of the two new vessels to be built *311 and operated on the ocean mail route from New Orleans, Louisiana, to Havana, Cuba. This application was made in the name of the Seatrain Lines which was the successor of the Over-Seas Railways, Inc. and the other corporations involved.
Before acting on the application, the Shipping Board notified other interests of the application. Especially were notified the Florida East Coast Railway Company and the Munson Steamship Line which requested opportunities to be heard. Advertisements of a hearing on the application of the Seatrain Lines and the proposed establishment of this ocean mail route were inserted in papers from Boston to Houston, Texas, including all those papers in the states mentioned in the Merchant Marine Act for the East coast. These advertisements were carried in these papers once a week for three weeks. The advertisement was in detail (jailing for bids on the route and setting out the requirements of the vessels to be used. (Merchant Marine Act, suprai, Sec. 406 [Finding 19].)
The Shipping Board invited the New York & Cuba Mail Steamship Company, the Florida East Coast Railway Company, the American Sugar Transit Corporation, the United Fruit Company, and the Munson Steamship Line to attend a designated hearing before the Board on the application of the Seatrain Lines for a loan from the Construction Loan. Fund. The meeting was held in September 1931 and representatives of these companies and others appeared and-were given full opportunities to be heard.
In October 1931 the Seatrain Lines submitted its bid in-accordance with the advertisement. None of the others-made a bid.
On October 31, 1931, the offer of the Seatrain Lines was duly accepted and the Assistant Postmaster General duly notified the Seatrain Lines of its acceptance.
The Chairman of the Shipping Board Committee on Construction Loans submitted to the Chief of Naval Operations,. Navy Department, the question of the usefulness of the proposed vessels to the United States in time of national emergency. After conferences between the Shipping Board and-the Navy Department and the plaintiff, an agreement was *312 readied whereby the Chief of Naval Operations and the Secretary of the Navy agreed upon the design of the vessels which would bring them into the class required by the Navy, in case pf national emergency, as naval auxiliaries.
After this approval by the Navy Department the Seatrain Lines entered into negotiations with several shipbuilding companies to construct vessels according to the plans and specifications agreed upon. As a result of these negotiations, invitations for bids were asked and an award was made to the Sun Shipbuilding & Dry Dock Company for the construction of two new vessels to be delivered before October 30,- 1932. There followed afterwards negotiations with the Shipping Board 'for a loan on these two vessels which resulted in the Shipping Board advancing the sum of $2,378,-794.00 on the two vessels. The construction cost of these ships amount to $3,174,251.96.
On December 3, 1931, the ocean mail contract between plaintiff and the United States was duly signed by the Postmaster General for the ocean mail route from New Orleans to Havana, known as Boute No. 56, for a period of ten years. [Finding 25.]
The two ships were constructed by the Sun Shipbuilding & Dry Dock Company in accordance with the plans and specifications filed with the Shipping Board and the Navy Department, and under the supervision of representatives of the Shipping Board and the Navy Department, and were completed and delivered to the Seatrain Lines on September 29, 1932, and October 5, 1932, respectively. These ships were duly documented under the laws of the United States and were known as S. S. Seatrain New York and S. S. Seatrain Havana.
This brief summary of the facts has been made of the steps taken but the court has also made elaborate findings in detail which show minutely every application, decision, and requirement which was taken. From the first application to the last decision, over seventeen months elapsed, and there were decisions made by three Cabinet members, by the Shipping Board, the Navy Department, and the Postmaster General in strict compliance with the statute. All adverse competitive interests and all prospective interests were given *313 full opportunity to be beard, and were heard and given an opportunity to bid. The ocean mail contract provisions of the Merchant Marine Act, supra, sections 401 to 411 inclusive and 413, were strictly and minutely complied with. Under the terms of these sections the Postmaster General, under certain terms and conditions, was given the right to enter into a contract for the carriage of ocean mail. In this instance, every requirement, every condition, and every provision were strictly and painstakingly performed and carried out, and the contract entered into by the Postmaster General with the plaintiff became a valid, binding agreement between the United States and the plaintiff.
In September 1932 depression in business generally had affected also the business in Cuba with the result that there were few shipments to Cuba and still less from Cuba to the United States. Before the delivery of the first of the two vessels, the Seatrain Lines petitioned the Shipping Board in September 1932, requesting that the route between New Orleans and Havana be extended so as to include a route from New York to Havana to New Orleans and from New Orleans to Havana to New York, and in this way employing the vessels in coastwise as well as foreign trade.
Hearings were held and as a result the Shipping Board by resolution agreed and authorized the Seatrain Lines to carry cargo on coastwise trade from New York to New Orleans via Havana for a period of six months commencing from October 6,1932. Thereupon the plaintiff made an offer to the Postmaster General to accept a reduction in the mail pay between New Orleans and Havana in view of the permission to engage in coastwise trade. This modification of the contract the Postmaster General agreed to and the contract was changed so that the payments made thereafter,, instead of being on the mileage rate, would be for “only such proportion of the pay named in the contract as the revenue earned on outward voyages over the mail route from foreign traffic bears to the total revenue earned on such voyages, the revenue from other trade from New Orleans to Havana being taken as such proportion of the revenue on coastwise trade from New Orleans to New York as the distance from New Orleans to Havana bears to the total dis *314 tance from New Orleans via Havana to New York.” Various extensions of this permission have been granted before expiration of the previous permission by the Shipping Board and its successor.
On September 13, 1932, plaintiff submitted to the Post Office Department its sailing schedule for the month of October for approval. The schedule submitted was approved by the Post Office Department.
Sailings were made by the S. S. Seatrain New York and S. S. Seatrain Havana from New York October 6 and 13, 1932, laden with cargo for Havana and New Orleans, and on the return they sailed from New Orleans October 13 and 20, laden with cargo for Havana and New York, and carrying mail for Havana.
Regular sailings were made by these vessels from New Orleans to Havana, Havana to New York, and from New York to Havana and then to New Orleans carrying mail and merchandise to Havana and from New York to New Orleans and from New Orleans to New York.
These schedules were carried out with few interruptions until December 1, 1933, when plaintiff was notified by the Postmaster General that no further mail would be dispatched by the Seatrain Lines vessels.
The reason assigned for this discontinuance was that Congress had attached to the Post Office Department’s appropriation bill, approved March 3, 1933, a proviso that no part of the money appropriated should be paid on the contract for ocean mail Route No. 56 to the Seatrain Lines, Inc. (47 Stat. 1489, 1510). In this notice was the statement that the action taken by the department was not intended to prejudice plaintiff’s claim under the contract but was simply a recognition of the action taken by Congress in prohibiting payment from the current appropriation. In reply to this notification by the Post Office Department the Seatrain Lines, Inc. notified the Department that sailings would be made under the regular schedule filed with and approved by the Department and that the Seatrain Lines would be, and would continue to be, ready, able, and willing to carry the mails on vessels on Route No. 56 in accordance with its contract.
*315 Since December 1, 1933, no mail has been delivered to or carried by the vessels of the Seatrain Lines, Inc.
Under the rights granted to the Postmaster General under the Shipping Act of 1928, he was authorized to enter into contracts for the carriage of ocean mail on certain routes designated by him under certain terms and conditions.
The Seatrain Lines, Inc. had been put to great expense and become heavily indebted to the Shipping Board in building these two vessels, which were to be used over the route designated by the Postmaster General, according to the plans as approved by the Navy Department and the Shipping Board.
When Congress delegates to an agency of the Government the right to enter into a contract under certain terms and conditions, and these terms and conditions are fully carried out and a contract entered into, it becomes a valid, binding agreement of the Government, and such valid contract is protected by the Fifth Amendment and cannot be taken away without making just compensation. The defendant can no more take away from a citizen his rights under a contract entered into with the United States than can a municipality, or a state, and a contract with the United States cannot be nullified by the United States unless it falls within the Federal police power or some other paramount power. No other power is claimed.
There is a contention by the defendant in its brief that this contract was entered into by fraud and collusion. No pleading has been filed alleging fraud or collusion; no evidence taken to prove either one of these contentions, and there is no semblance of any action by any head of a department, agent of a department, committee, or individual which gives any color or reason for such a charge. Every step and every action of the department was published in the newspapers, including advertisements and notices, and full hearings were granted to adverse and prospective interests. In every instance a decision was made in favor of the Seatrain Lines, Inc. We are unable to find the smallest infraction of any law of Congress, or any rule or regulation of any department which has not been fully complied with. There were *316 many adverse interests of great strength and power which were opposed to the establishment of this route because of the probable interference with their own established business but, after open and fair hearings, the decisions of the Board, before whom the hearings were held, were invariably in favor of the Seatrain Bines, Inc.
We cannot accept a mere charge of fraud in a brief unsupported by pleading or evidence, as a basis sufficient to justify us in giving it factual notice in our special findings.
Plaintiff had incurred heavy expense in the building of these two vessels in strict compliance of the shipping act of 1928 and had obligated itself to the Shipping Board for millions of dollars to be paid regularly at stated intervals until the mortgages held by the Shipping Board were paid. It had pledged the revenue derived from the mail contract to be held to apply to the loan made by the Shipping Board. The plaintiff has fully complied with the terms of repayment.
In our judgment, defendant has breached the contract and by this breach plaintiff has suffered damages.
In the passage of the 1934 appropriation act for the Post ■Office Department Congress did not attempt to repudiate plaintiff’s contract. It simply deprived the Department of the right to use any of the money to make payments on this mail contract.
Plaintiff had a right under the contract to be paid as called for by its terms and the failure to pay was a breach of the contract by the defendant.
As was said in the Sinking-Fund Cases, 99 U. S. 700, 719,
The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen.
See also Lynch v. United States, 292 U. S. 571, 580.
The next question we have to meet is that of the amount of damages to which plaintiff is entitled by reason of the breach of the contract by the defendant.
The prima facie measure of damages for the breach of a contract is the amount of the loss which the injured party *317 has sustained. United States v. Behan, 110 U. S. 338, 344.
The class to which a vessel belonged was to be designated by the Postmaster General based on speed without regard to tonnage and the Postmaster General had to determine the number of nautical miles by the shortest route between ports involved. (Merchant Marine Act, supra, Sec. 408b). The payments were to be made for the' number of miles on each outward voyage without regard to the actual mileage traveled.'
The Postmaster General classified these vessels and determined the number of miles from New Orleans to Havana! and from New York to Havana. He certified for payment the vouchers for the voyages actually made but no payment was made by the General Accounting Office on the ground that the Congress was examining into the contract. No adverse ruling was made by the Comptroller General concerning the validity of the contract. The Postmaster’ General contended before all committees of the Congress that the contract was valid and his good faith in the legality of the contract was the certification for payment of the vouchers. Payment has never been made for any voyage on which the-mail was carried.
The contract was for ten years commencing in October 1932 which would give it life to October 1942. However, on June 20,1941, the Maritime Commission requisitioned the possession and use of the vessels S. S. Seatrain New York and S. S. Seatrain Havana and delivery under the requisition order was made on June 25 and July 2, 1941, respectively.
The plaintiff performed part of the contract and was ready, willing, and prepared to perform the entire contract to the time when the vessels were taken over by the defendant. The plaintiff was required to perform at least 50 trips a year and was never required to perform more than that number.
Based on fifty trips a year the plaintiff would have earned from the commencement of the contract to the dates when the ships were actually taken over by the defendant the sum of $755,235.63, less expenses saved to the time of requisition in the amount of $24,456.51, leaving a balance of $730,779.12, which constitutes and is the actual damage the plaintiff has suffered by the breach of the contract by the defendant.
*318 Plaintiff is entitled to recover the sum of $780,779.12.
It is so ordered.
Madden, Judge; Jones, Judgef and Littleton Judge, concur.
Whitakee, Judge, took no part in the decision of this case.