**BLACKHAWK HEATING & PLUMBING CO., INC. and Donovan Construction Company, a Joint Venture**

v.

**The UNITED STATES.**

**No. 364–74.**

United States Court of Claims.

May 14, 1980.

Donald R. De Renzo, Boca Raton, Fla., attorney of record, for plaintiff. De Renzo & Mehok, Boca Raton, Fla., of counsel.

Lawrence S. Smith, Washington D.C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant.

Before DAVIS, KUNZIG and BENNETT, Judges.

\* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

## OPINION

### PER CURIAM:

This case comes before the court on the parties' exceptions to the recommended decision of Trial Judge John P. Wiese, filed March 14, 1979, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,\* it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, the court gives judgment as provided in the following Conclusion of Law.

### OPINION OF TRIAL JUDGE

WIESE, Trial Judge: This action arises out of an alleged breach, by the Government, of a contract settlement agreement. The controversy centers upon the final article of that agreement which provided that the Government's liability was to be "contingent upon the availability of appropriated funds from which payment in full can be made." Two basic issues are raised. The first requires a determination as to the meaning of the contract language in dispute; the second, a determination as to whether there occurred an unavailability of appropriated funds within the meaning of that language. On the basis of the accompanying findings of fact [1] and for the reasons set forth in this opinion, it is concluded: (i) that the contractor is entitled to a judgment of $2,000,000 together with interest on that amount, at the contract rate of 9.75 percent per annum, from December 10, 1973, until the date of payment; (ii) that the contractor is also entitled to the interest due on $6,000,000, again applied at the contract rate of 9.75 percent per annum, for the period from December 10, 1973, through January 3, 1974; (iii) that the Government

1. The case initially went before the Appellate Division pursuant to the parties' motions for summary judgment. By order of June 27, 1975, the motions were denied without prejudice and the matter was remanded to the Trial Division for trial or other appropriate disposition.

is not liable for the remainder of the amounts in issue; and, (iv) that, excepting the payments here determined to be owing to the contractor, the parties are no longer bound by the terms of their settlement agreement.

## I. Facts **

A. *Negotiation and Execution of the Settlement Agreement.* On June 29, 1967, the Veterans Administration awarded the joint venture of Blackhawk Heating & Plumbing Company, Inc. and Donovan Construction Company (hereinafter referred to as plaintiff or the contractor), a fixed-price contract for the construction of a medical, surgical and neurological hospital, together with related improvements, at the Veterans Administration Hospital complex at Northport, Long Island, New York.

During the course of performance various claims and disputes arose between the parties most of which, despite negotiations aimed at resolving them, remained in issue at the time the work was completed and the project accepted by the Government. Thereafter, efforts to bring these areas of disagreement to an end by means short of litigation continued to receive the parties' attention. In mid-September 1973, this being some 15 months after the work had been completed and also after various settlement offers and had been made and rejected by both sides, the Administrator of Veterans Affairs (the Administrator) decided that the best interests of the Government would be served if the contractor's claims (which totaled in excess of $16.3 million) could be resolved in their entirety for a figure not in excess of $10.4 million. Negotiations directed towards the accomplishment of this objective began in mid-October 1973 and near the end of this same month, the parties had arrived at a compromise figure of $10.3 million and had achieved what was then thought would be the final text of their agreement. How-

ever, as we shall come to see, there were some changes that would be made.

As to the details of the negotiations that had transpired to this point, it is necessary to identify only two particulars. The first has to do with the scope and type of audit that the Government would perform in order to verify the contractor's claimed costs. On this matter, the Government's position had been that the contractor's total cost claim should be broken down into its constituent components on a claim-by-claim basis and the Government should be entitled to test the reasonableness and the appropriateness of each of the costs so identified under the standards or criteria of the Federal Procurement Regulations.[2] The contractor resisted this effort (as it had all along) believing, among other reasons, that the complexity of the construction job itself (there having been more than 300 change orders issued over a course of performance that extended three years beyond the initially-scheduled completion date) defied any accurate means of cost presentation and subsequent third-party audit evaluation. The merits of the contractor's arguments gained the day; thus the agreement that was drafted (as well as the agreement that was later to be executed) specifically recited that the "Government agrees that if * * * Contract Costs are charged in accordance with company policies and generally accepted accounting principles, the Government accepts them as reasonable and necessary for the purposes of this equitable adjustment and settlement, and the reasonableness and necessity of these costs shall not result in an adjustment of the Settlement Price."

The second and more important point that bears upon the settlement agreement concerns the matter of its funding. In the earlier settlement negotiations on this contract, as well as through several preceding settlement agreements which these same parties had entered into in connection with other unrelated Veterans Administration

---

** The facts recited here repeat some, but not all, of the findings of fact that accompany this opinion.

2. Contract Cost Principles and Procedures, 41 C.F.R. §§ 1–15.401—15.403–7 (1973).

construction projects,[3] the contractor had been made generally aware of the fact that payment of a settlement amount required the agency to rely upon appropriated funds initially earmarked for other construction project purposes. This fund shifting procedure, known more generally in the Veterans Administration as the reprogramming procedure, had been explained to the contractor as an administrative mechanism that involved, first of all, a notification to the pertinent congressional appropriations committees (those concerned with the Veterans Administration's budget) of the agency's decision to effect a settlement by a shifting of unobligated funds and secondly, a waiting period to allow for any committee response or reaction.

Returning now to the narration of events, it soon developed that the text of the agreement that had resulted from the parties' October negotiations was seen, upon in-house review in the agency (and before being signed there), to require certain changes and additions. Of these, the only matter of importance concerns the Veterans Administration's insistence that there be added to the agreement a provision making the Government's liability under the agreement subject to the availability of appropriated funds.

What prompted the Government's demand for the addition of such a clause is of lesser importance than what was said about it to the contractor at the time it came to be considered. As to the first point, it is enough to say that the General Counsel of the Veterans Administration, though he had been told that funds to pay the settlement were available (that is, would be available upon the completion of a repro-

gramming action) nevertheless considered it a good idea to add the contingency language. The Associate General Counsel of the Veterans Administration, being the individual who had been assigned the role of chief negotiator in this settlement, went along with the idea because he saw such a provision as a means of protecting the certifying officer (the individual who was to sign the agreement on behalf of the Government) against any possible violation of the Anti-Deficiency Act.[4]

The language which the Government proposed to add, and which, in fact, was later included in the executed agreement, read as follows:

Article 8. The Government's obligation hereunder is contingent upon the availability of appropriated funds from which payment in full can be made.

When this language was first presented to the contractor (in a telephone conference between the Associate General Counsel and the contractor's attorney), the question immediately asked was what the language meant. When told that the clause meant that no legal liability should arise until there were funds available for the payment of the settlement, the contractor's attorney responded by asking whether the Government had the money with which to pay the settlement. The answer given was "[y]es, we have the money, money is not a problem."

This last answer then led to the question why, in view of the availability of funds for payment, there should be any need at all for the proposed contract language. The Associate General Counsel answered by saying that the Administrator and the General

---

3. In addition to their Northport Hospital settlement agreement, the parties had also concluded, at earlier points in time, settlement agreements on construction claims associated with other Veterans Administration hospital projects. These included: the Hines Hospital settlement (Hines, Illinois) executed between the Veterans Administration and the joint venture of Blackhawk-Donovan on February 11, 1970, the Brooklyn and Manhattan Hospital settlements (New York City, New York) executed between the Veterans Administration

and Blackhawk on November 21, 1972, and the Pittsburgh Hospital settlement (Pittsburgh, Pennsylvania), executed between the Veterans Administration and a joint venture that included Blackhawk (but not Donovan) on November 21, 1972.

4. The Anti-Deficiency Act, 31 U.S.C. § 665 (1976), has, as its principal purpose, the prohibition of expenditures or the creation of contract obligations in excess or in advance of appropriations.

Counsel were concerned about a possible violation of the Anti-Deficiency statute and the added contract language would offer protection against this concern. Still not satisfied (and understandably so) the contractor's attorney questioned why, if money was not a problem, there should be any concern with a violation of the statute. The response to this last question was simply that the Administrator and the General Counsel were insisting upon the inclusion of the contingency language in the agreement.

With this conversation as background, the contractor's attorney contacted the joint venture's principals (Mr. Donovan, the president of Donovan Construction Company and Mr. Machata, the president of Blackhawk Heating & Plumbing Company) to discuss the matter with them. What developed from these conversations was a collective assessment that the Government, although it had the money to satisfy the settlement amount ($10.3 million), was nevertheless insisting upon the inclusion of the contingency language in order to give total assurance to the Government's signatory that the agreement could be executed without risk, that is, without fear that the agreement might exceed the limits of appropriated funds.

What prompted this understanding on the contractor's part was an experience shared in an earlier settlement agreement with the Veterans Administration, identified as the Brooklyn settlement. In that case, the settlement agreement had not included language similar to the contingency language now being proposed and, at the time of its intended execution, the contracting officer balked at signing the agreement because of his belief that the agency did not have sufficient funds to pay the settlement. (As it turned out, the contracting officer had not been made aware that funds to pay the settlement were to become available through the reprogramming of monies initially earmarked for another construction project.) To the plaintiff this earlier experience was relevant because it explained why the Government should now be insisting upon contingency language while asserting, at the same time, that funds were

available with which to honor the settlement obligation. Accordingly, it was decided that the contractor would accept the contingency language which the Government had proposed.

On November 1, 1973, the parties met to execute the settlement agreement. The agreement, as it then stood, included the contingency language (incorporated as Article 8 of the agreement) and reflected certain other changes (not otherwise relevant here) which the Government had also found necessary to include. On this occasion, the purpose of the contingency language again surfaced. As his own testimony recounts it, the Associate General Counsel had been surprised at the contractor's ready acceptance of the contingency language and, because of this, questioned the contractor's understanding of it. The contractor's attorney answered by repeating what he previously had been told, namely, that the language was to protect the certifying officer against a possible violation of the Anti-Deficiency Act. The Associate General Counsel endorsed this interpretation but then added the following: "There is one more contingency and that is if there were an affirmative action by the Congress that would prevent the administrator from paying." To this identification of an added purpose for the contingency language the contractor gave no verbal response. Rather, as the Associate General Counsel described it, "the reaction was really a shrug-off." Thereafter, no more was said on the subject; the agreement was signed.

B. *Obstacles to Implementation of the Agreement.* Following the signing of the settlement agreement, the Veterans Administration initiated the actions necessary to carry out the agreement. Essential contract documentation was prepared, instructions regarding an audit of the contractor's books and records were transmitted to the Defense Contract Audit Agency and letters informing of the reprogramming of funds were forwarded to the various congressional committee members concerned with the agency's appropriations.

By December 7, 1973, the examination of the contractor's books and records had progressed to a point where the auditors were able to advise the Veterans Administration that, on the basis of a selective review of the contractor's claimed costs, sufficient verification as to the total amount of those costs had been establi-hed so as to permit the agency to proceed in accordance with its obligation under Article 7(b) of the settlement agreement, namely, to pay $8,000,000 not later than 40 days after the settlement agreement's execution. (The agreement called for two principal payments one of $8,000,000 to be paid within 40 days of settlement execution; the second, covering the remainder of $2,300,000 was to be paid within 90 days of settlement execution. Sums not paid when due were subject to interest at 9.75 percent per annum.)

However, despite the necessary audit verification, the amount then due was not paid to the contractor. What caused the agency to stay its hand were letters received from Senators Vance Hartke (Chairman, Committee on Veterans Affairs, United States Senate) and William Proxmire (Chairman, Subcommittee on HUD-Space-Science-Veterans, United States Senate), and from Representative Edward P. Boland (Chairman, Subcommittee on HUD-Space-Science-Veterans, House of Representatives), each expressing to the Administrator serious concern about the settlement agreement. The letters focused on a report that had been received from the General Accounting Office concerning the propriety of the settlement and all urged the Administrator to desist from the reprogramming action.

The admonition to put aside the reprogramming action was not acceded to by the Administrator—at least not initially. On December 7, 1973, the Administrator responded to the concerns that had been raised about the settlement agreement. In separate letters of this date to Senators Proxmire and Hartke (and presumably also to Representative Boland) the Administrator made reference to the written answers which the agency had provided to the General Accounting Office on December 4, 1973 (copies of which had also been sent to the present addressees) and then went on to point out that the settlement agreement which had been concluded was not only fair both to the Government and the contractor but also that "[c]ommencing today, if we do not make this payment [$8,000,000], interest charges of nearly $2,200 per day must be paid under the agreement." The Administrator concluded by saying "I, therefore, deem it in the best interest of the Government to proceed in the immediate future with orderly and substantial fulfillment of the terms of the settlement agreement."

The Administrator's decision to go forward with the settlement payment was met with an immediate, although not direct, response from the interested members of the Congress. In hearings then being held before the Senate Appropriations Committee on H.R. 11576, a bill entitled the "Supplemental Appropriations Act, 1974," Senator Proxmire offered an amendment aimed at restricting the Veterans Administration's contract settlement authority. (The specific language of this legislation is given at a later point.) Following discussion of this matter on the floor of the Senate (see 119 Cong.Rec. 41054, 41057–41064 (1973)), the issue was referred to a conference committee. In that committee's report, H.R. Rep.No. 93–736, 93d Cong., 1st Sess. (1973), the action that was taken was reported as follows:

Amendment No. 7: [The conferees agree] * * * to insert language requiring independent audit and approval through the appropriations process of Veterans Administration contract settlements, with an amendment to exclude settlements of $1,000,000 or less. * * *

Although this provision confirms current understandings of reprogramming authority, the conferees recognize that it could place a hardship on contractors who have recently negotiated a settlement with the Veterans Administration, but have not been paid by the agency. The conferees agree that a secured advance payment in an amount not to exceed $6,000,000 can be made in such situations prior to the effective date of this bill,

provided that such payment is formally approved by the Office of Management and Budget, with the understanding that an independent audit will ultimately be performed and that final payment will be subject to Congressional approval.

It is the sense of the conferees that all claims against the Veterans Administration should be processed through the agency board of contract appeals unless there is adequate legal analysis, audit information, and claim documentation to show that settlement outside the board of contract appeals is in the best interests of the Government. This procedure should be taken into consideration when appropriations are requested to fund such claims. It is further the sense of the conferees that when funds are requested to settle such claims, the sum should include funds to pay interest on the claim settlement.

Notwithstanding the position expressed in the conference report, the General Counsel's office of the Veterans Administration held to the view that the agency could proceed with payment according to the terms of the settlement agreement. The language of the conference report, said this office, "does not have the force and effect of law, but reflects the views of the conferees as to an action which they feel would be suitable for the Agency to take regarding an already existing settlement agreement * * *." The Administrator, however, was of a different mind; his decision was to adhere to the conferee's views. Accordingly, on January 3, 1974, a payment of $6,000,000 was transmitted to the contractor in payment of a portion of the principal amount then due under the settlement agreement.

On this same day, January 3, 1974, the Supplemental Appropriations Act, 1974, was enacted into law. Section 301 of this statute (Pub.L.No. 93–245, 87 Stat. 1071, 1072) provided that:

* * * No funds appropriated in this or any other Appropriation Act for any fiscal year shall be used to make a settlement of any construction contract by the Veterans Administration in an amount in excess of $1,000,000 which has not been audited independently as to the reasonableness and appropriateness of expenditures and which has not been provided for specifically in an Appropriations Act.[5]

Following enactment of the statute, there was, for a time, no change in position on the part of the Veterans Administration. In particular, on the matter of the audit's scope, the Veterans Administration remained committed to the conduct of an audit that complied, in the main, with the type of audit that had been agreed upon in the settlement agreement.

Word of the agency's position soon found its way back to the Congress and was there met with immediate disapproval. On May 30, 1974, Senator William Proxmire wrote the Administrator to voice his strong displeasure with the agency's intention to continue with a limited audit contrary to the language of the statute and of the conferees' report. The letter concluded with the following statement:

The conferees on H.R. 11576 recognized the hardship this language might create in the Northport case by approving an advance payment in an amount not to exceed $6,000,000 in the case of contract settlements negotiated but not paid, providing the payment was made before the bill was enacted into law. We both know that this language was included solely to reach an accommodation in the Northport case. Of course such an accommodation would have been unnecessary if, as you seem to be arguing in your discussions with GAO, the agreement could be carried out in good faith without regard

---

**5.** The text of the statute as it now appears in 31 U.S.C. § 700d (1976), varies slightly in its opening wording from the initial language that appears in the statute at large. Whereas the statute at large provides that "[n]o funds appropriated in this or any other Appropriation Act for any fiscal year shall be used * * *," the code version states that "[n]o funds appropriated in any Appropriation Act for any fiscal year shall be used * * *." Apart from this difference, no other changes occurred.

to Congressional action which occurred after the agreement was reached. If you accept the fact that you must return to the Congress for approval of any payments in excess of $6 million, as the law requires, it is beyond me why you believe you can ignore the law's mandate for an audit "as to the reasonableness and appropriateness of expenditures."

Should you persist in your refusal to sanction an audit "as to reasonableness and appropriateness of expenditures" I can assure you that I will recommend that the Senate HUD-Space-Science-Veterans Appropriations Subcommittee simply decline to consider any further request for funds to make payments in pursuance of the Northport settlement. To do otherwise would be to flout a law passed by the Congress six short months ago.

Again rebuffed in its effort to carry out the terms of the settlement agreement, the Veterans Administration responded as it had once before—it acceded to congressional direction. Thus, on June 19, 1974, it advised the contractor that it would be necessary to expand the audit to include reasonableness and appropriateness of expenditures as those terms were used and understood in the applicable provisions of the Federal Procurement Regulations.

The contractor opposed this turn in position. There then followed an exchange of views on the subject in which neither side was able to accommodate the other's position. The contractor insisted upon adherence to the terms of the settlement agreement; the agency responded by saying that the mandate of the statute had to be followed and that absent this, Congress would not make the necessary funds available. On September 23, 1974, the contractor made a written demand for the payment of all unpaid sums under the settlement agreement together with the interest due thereon. Payment was not made and this suit followed.

## II. Discussion

■ The controversy in this case focuses, in the main, on the meaning to be given to Article 8 of the settlement agreement. As the facts themselves might have foretold, on this issue the parties now stand sharply divided. Both sides take, as their starting position, the fact that the settlement agreement was concluded in light of the appropriations that became available through the enactment into law, on October 26, 1973, of Pub.L.No. 93–137, an act which made available $68,343,000 to the Veterans Administration for expenditure on major construction projects. Both sides also identify reprogramming considerations as a reason for the existence of Article 8.

It is in their perception of those considerations, however, that the parties differ greatly. To the contractor, Article 8 was meant only to give recognition to the fact that the settlement negotiations had not identified the appropriation status of the relevant account from which the settlement funds were to be drawn. For that reason it became, as the contractor now puts it, "entirely feasible to the Plaintiffs that the Defendant would require a clause that would protect the Certifying Officer in the event that for some unknown reason, the Defendant's concurrent representation as to the availability of funds, viewed in its normally understood context, proved to be inaccurate."

The Government espouses a much different position. Its contention is that Article 8 was not concerned simply with the remote possibility of a shortfall in appropriated funds. Rather, the major purpose of the article was to recognize the risks inherent in the shifting of appropriated funds—risks which might materialize in the form of a congressional disapproval of a reprogramming action or in some other form of interdiction by the legislature which would produce an equivalent result, namely, render appropriated funds unavailable for payment of the settlement amount. It is the Government's position that the contractor was fully aware of the limitations governing the agency's use of appropriated monies, specifically, that a reprogramming action could not go forward absent congressional approval and, beyond this, that the

contractor had also specifically been told that the Government's liability should not survive an affirmative action by the Congress that would prevent the Administrator from paying the settlement amount.

There are then, two distinct problems involved in the interpretation of Article 8 each of which focuses upon the contractor's understanding. The first, or what might here be best called the primary issue, is concerned with the agency's reprogramming procedure; the second is concerned with other contingencies bearing upon the availability of appropriated funds. Each of these matters is discussed in the section A that follows. In section B, consideration is given to the relationship between Article 8 and the later facts of the case.

A. *1. The Primary Issue: The Agency's Reprogramming Procedure.* In considering the intended relationship between Article 8 and the agency's reprogramming procedure, one can begin with what is not debated: the contractor was generally aware of the fact that payment of a settlement amount required the agency to shift funds from a source for which they may initially have been earmarked. This much the contractor acknowledged. Indeed, it was precisely this knowledge, gained from the parties' earlier experience in the Brooklyn settlement, that led the contractor, in the case of the instant settlement, to accept as plausible the seeming contradiction between the Government's insistence upon Article 8 and its simultaneous assurances that funding was not a problem. What the contractor had learned from this earlier situation was that, until a reprogramming action had been completed, there could be a need, although perhaps no more than a technical one, to protect a certifying officer who was entering into an obligation chargeable to an account then temporarily exhausted of appropriated funds. The risk

perceivable in such circumstances was that, because of concurrent obligations or planned commitments, existing appropriations might not actually be sufficient to permit the contemplated transfer of funds.

But it is a long step to read into this basic level of understanding the further proposition now asserted by the Government: that the contractor knew and understood that a reprogramming action would require congressional approval. Neither as a proposition of law nor as an issue of fact can that argument be sustained.

The reprogramming procedure in issue in this case was first put into use by the Veterans Administration in the latter part of 1969. It was a self-created administrative mechanism whose main apparent purpose was to keep the congressional appropriations committees (those concerned with the agency's budget) informed of the manner in which appropriated funds were being spent, in particular of those expenditures for project cost increases which required the use of funds that the budget process had initially earmarked for other construction projects. Although it was the case during the period pertinent to this suit (1969–73) that the agency's receipt of lump-sum appropriations left it free to depart from budget projections in its obligation of those funds,[6] it made for better relations with Congress (the appropriations committees), and thereby facilitated the process of obtaining replacement appropriations, to alert the appropriations committees to those expenditures that diverted funds from the objectives for which they had been appropriated.

But of more importance to this case than the objectives of the reprogramming procedure is the fact that that procedure was adopted by the agency in service of its own needs; it was not created in response to any statutory directive. Nor, for that matter,

**6.** To supplement the statement in text, it should be noted that the amounts requested or earmarked for the individual items that comprise the budget estimates presented to the Congress, and on the bases of which a lump-sum appropriation is subsequently enacted, are not binding on the administrative officers un-

less those items (and their amounts) are carried into the language of the appropriations act itself, see 17 Comp.Gen. 147, 150 (1937), or, as became the case here, there exists a statute that places a general and continuing restriction upon any agency's right to shift funds within an appropriation account.

was it ever elevated to the status of a published regulation. This being the case, the reprogramming procedure cannot be passed off now as anything more than what it plainly was: an informal working arrangement between the agency and the congressional appropriations committees with whom the agency had to deal. Its requirements do not have the force and effect of law. It follows, therefore, that a failure on the part of the agency to observe the requirements of its reprogramming procedure could offer no legal basis for challenging the legality of the expenditure involved, 55 Comp.Gen. 307, 327 (1975); similarly, the failure of the appropriations committees to acquiesce in the agency's decision *to satisfy an obligation through a reprogramming action* would not support a claim of unavailability of appropriated funds based on such grounds.

That the present conclusion marks no new departure from the Veterans Administration's own prior understanding of the matter is readily apparent from the record. Without exception, every Government witness who had had any substantial involvement with the instant settlement, from the Administrator on down, conceded that a negative congressional response to an intended reprogramming imposed a practical rather than a legal impediment to the agency's right to effect payment under the settlement agreement. Only now, in this lawsuit, does the Government seem to argue otherwise. For the reasons given, the contention must be rejected.

Similarly unacceptable is the argument that congressional approval of a reprogramming action, even if not legally required, was nevertheless the ground rule to which the agency always adhered. The contractor flatly denies any such knowledge or understanding of the reprogramming procedure or of any purpose on the part of the Government to include such a condition within the meaning of Article 8. On this point, the record stands convincingly in the contractor's favor.

Not the least of the problems that the Government's argument must face up to is the fact that the Associate General Counsel (the agency's chief negotiator in the instant settlement) made it a specific point in his testimony to state that "I was very careful in my testimony to stay away from the fact that I ever said that it [reprogramming] required Congressional approval. What I said was that money to pay the settlement required reprogramming and that reprogramming was a process where you advised the Congress, but I have never said or taken any position that I advised this contractor that an approval was a requisite."

The Government attempts to overcome the force of this statement by claiming, first of all, that the Associate General Counsel was without authority to conclude any agreement that ran counter to established procedures, and secondly, that, in the negotiations which led to the parties' earlier settlement agreements, the contractor had been repeatedly alerted to the conditional availability of appropriated funds when applied to settlement purposes. Neither argument gains the Government much.

As to the first point, it is sufficient to point out that the reprogramming procedure itself, meaning the document describing it, makes no mention whatever of a need for congressional approval. The procedure speaks only of advising the appropriations committees of the Congress of cost increases on projects for which construction funds have been appropriated and, so far as pertinent here, of the method by which the increase will be funded, *i. e.*, whether from savings, from project cancellations, or, from unobligated balances earmarked, but not immediately required for, other specific projects. On the face of it, therefore, the Associate General Counsel's statement disavowing congressional approval as a required element of the reprogramming procedure was surely not a statement out-of-step with that procedure.

As to the contention that earlier settlement discussions had brought home the fact that settlement funds were always viewed in the agency as being of a conditional nature—*i. e.*, available through a reprogramming action only if given congression-

al approval—this too is a position falling short of the facts.

Among the several Government witnesses who testified in this case with respect to discussions had with the contractor in the preceding settlement negotiations, there was not one whose testimony would measure up to what the Government now claims was said. These witnesses identified congressional involvement in the reprogramming procedure in various ways but the theme was always the same: the congressional rule was a purely passive one.

According to their various accounts, the purpose of the reprogramming notice had been explained to the contractor in these terms: (i) to give Congress an opportunity to object; (ii) to obtain a tacit approval from Congress; (iii) to obtain a clearance from Congress; and (iv) to touch base with Congress. Indeed, to underscore the point, witnesses who did, at first, mention congressional approval as being an essential ingredient of the reprogramming procedure either corrected such testimony on their own or yielded the point on cross-examination. There is simply nothing in the recounting of the parties' earlier dialogues that would establish what the Government now claims was the case, namely, that the contractor had been repeatedly put on notice that congressional committee approval was the indispensable requisite to a reprogramming action in the absence of which the agency would not proceed with payment.

Nor might the contractor have been cautioned to draw any different conclusions about the matter from the text of the earlier settlement agreements. None of these agreements contained any contingency language, this despite the fact that all depend-ed upon reprogramming actions to generate the funds necessary for their payment. While these "omissions" are now said to have been a mistake, the court sees it otherwise. The agreements were not made conditional upon the availability of appropriated funds for, until the happening of the events which triggered this lawsuit, the agency never had occasion to deal with a negative congressional reaction to a notice of reprogramming. In short, as was the case with the testimony that has here been recounted, the written agreements too never gave the matter of an adverse congressional reaction a second thought.

The Government attempts to make much of the fact that the contractor, in pursuing certain follow-up matters connected with the parties' Hines Hospital settlement of February 1970, had occasion to refer to or to identify congressional approval as an element of the reprogramming procedure. These two instances, the details of which are left to a footnote,[7] are much too insubstantial to overcome the negation of position that pervades all the rest of the Government's proof. Indeed, considering that proof, it would be far more reasonable to assign to the contractor's isolated use of the term "congressional approval" nothing more than a perfunctory meaning, to wit: an approval role in name only.

The point bears repeating that nowhere in the Government's proof—be it in the reprogramming procedure itself or in what was said about that procedure during the various settlement negotiations or in the written agreements which followed them— does one even come close to finding any verification of the contention that, in the absence of congressional approval of a re-

---

**7.** The first reference appears in a letter of April 26, 1971, from the joint venture to the Administrator of the Veterans Administration. In this letter, which dealt chiefly with the complaint that had been raised by a certain subcontractor respecting his share of the settlement amount, the joint venture wrote: "As you will recall the settlement figure, subject to congressional approval was $5,750,000."

The second reference appears in deposition proceedings of June 1972 that related to a suit that had been brought against the joint venture by the trustee in bankruptcy of a former member of the joint venture who had become bankrupt during the course of the work. Some of the questions that then were asked of the deponents by the contractor's attorney (the same attorney involved in the instant settlement) suggest an awareness that the reprogramming of funds procedure involved congressional committee approval.

programming action, the Veterans Administration would not consider, either as a matter of established procedure or settled practice, appropriated funds to be available for payment of a settlement. And even if one looked only to the agency's actions in this case rather than to its words, the proof would still be lacking. After-the-fact rationalizations cannot obscure what those actions so plainly show: it was obedience to political pressure rather than allegiance to established procedures which dictated the decision not to go forward with the reprogramming.

Such being the state of the proof, it cannot now be accepted that a requirement calling for congressional approval of the reprogramming action was subsumed in the meaning of Article 8. Insofar as reprogramming was concerned, that article means no more than what the contractor had been told by the Associate General Counsel: it was to guard against a violation of the Anti-Deficiency Act, a precaution mutually understood to have been taken in the light of an uncertainty concerning the source from which appropriated funds were to be drawn.

*2. The Additional Meaning of Article 8.* It will be recalled from the facts earlier given that, at the time the settlement agreement was signed, the Government took occasion to declare that Article 8 was intended not only to guard against a violation of the Anti-Deficiency Act but was also meant to protect the Government from liability in the event of an affirmative action by the Congress that would prevent the Administrator from paying. Not unexpectedly, the Associate General Counsel's statement is now the subject of much argument, the most serious thrust of which is the plaintiff's contention that the words are deserving of no legal significance whatever.

The argument draws heavily on the attendant circumstances; they are indeed disconcerting. By the witness' own account of it, the exchange which brought out his statement occurred during a conversational lull and while the parties were awaiting the arrival of the contacting officer, all this, the

court might add, being just shortly before the agreement was to be signed. Further— and this again is according to the declarant's account—the full purpose of Article 8, as then revealed by the Government, not only carried beyond the contractor's own announced understanding of the matter, but represented an expression of intent that had never previously been revealed to the contractor. Despite this, the Government's statements are said to have elicited no more than a shrug-off, and this not even from the contractor's attorney—the party to whom they had been addressed—but from the sponsor of the joint venture, Mr. Donovan. No less troubling is that not one further word of explanation was given nor was any confirmation of understanding sought. The Associate General Counsel simply assumed that the concerns subsumed in this added purpose for Article 8 were judged to be as remote to the contractor as they then were to the Government. Silence seeming in order, the matter was therefore simply dropped.

Despite this background and the uncertainties of communication that it would suggest to all, the court cannot place the Government's words in limbo—to treat them simply as utterances that may be ignored. Had Article 8 been the subject of prolonged or intensive prior discussion, then perhaps it would be in order to dismiss the Government's statements as no more than spurious afterthoughts deserving of no attention.

But such was not the situation here. Article 8 was a last minute interjection that was introduced by the Government at a point when the negotiating representatives had assumed that a completed agreement had already been achieved. Its purpose was discussed between the parties—at the time it was first raised—only in the briefest of fashion and the understanding of the clause which the contractor had arrived at prior to the date of signing was as much, if not more, the product of its own perception of the Government's concerns than of any clear expression of purpose from the Government itself.

As has been noted in this opinion, the parties' views did correspond, at least insofar as a primary meaning for Article 8 was concerned. However the circumstances out of which that understanding evolved should have cautioned all to seek verification, for certainly a clause of such seeming importance to the Government would warrant more than just the cursory attention that had been given it up to this point in time.

Indeed, it was precisely this purpose which prompted the Government to address the subject at the time of signing. In terms of time, place, and manner, the Government's articulation of purpose may surely not be praised. The dialogue had been initiated at the last moment because of the lingering uncertainty on the Government's part that the contractor appreciated the full intended meaning of Article 8; it elicited a response that confirmed that uncertainty and ended with a surmise that, by a shrug, it had been manifested that all was now understood.

Yet, despite these attendant deficiencies, it must be concluded that at least enough was said to have placed the contractor on notice that Article 8 was intended to reach beyond immediate concerns with the sufficiency of existing appropriations. In other words, the contractor was made aware that there was more to Article 8 from the Government's point of view than the contractor had first thought. Whether that additional purpose was actually understood is, of course, another matter.[8]

■ The record as it stands is susceptible to two interpretations. The first is that there was no agreement reached at all between the parties. An inferable absence of mutual understanding would follow from the fact that, while each of the parties had been made aware that his own understanding of Article 8 was at odds with the other, neither attempted to clarify the matter. The contractor sought no further explanation; the Government provided none. This then, would be a plain case of an absence of mutual understanding attributable to mutual fault. Restatement (Second) of Law, Contracts § 21A(1)(b), Comment d (Tent.Draft Nos. 1–7, 1973). The other reading that may be given to the record—and this seems the more realistic one—is to conclude that the contractor understood what the Government had said—for the words were certainly plain enough—but thought the likelihood of an affirmative action by Congress so remote as to require no comment. This was the conclusion which the Associate General Counsel drew from the contractor's shrug—it was both an acknowledgement of understanding and a dismissal of concern. Since this conclusion not only fits the facts but also preserves the benefit of the parties' agreement, it represents the preferable interpretation to apply. *See Consumers Ice Co. v. United States,* 201 Ct.Cl. 116, 123–24, 475 F.2d 1161, 1165 (1973). Accordingly, for the reasons stated, it is concluded that Article 8 not only comprehends a concern with the Anti-Deficiency Act but also was intended to free the Government from its liability under the settlement agreement in the event there should occur an affirmative action by the Congress that would prevent the Administrator from paying.

■ B. *The Application of Article 8 to the Facts.* In considering the meaning of Article 8 in light of the facts that transpired here, one conclusion that may be

---

8. The court is not unmindful of the fact that the proof which established the Government's claimed statement rested only upon the testimony of the declarant himself, the Associate General Counsel. Neither Mr. Donovan nor his attorney could recall the statements and no other witness addressed the point. Mr. Donovan did state that had such a further condition been announced he would not have signed the agreement, at least not without a very thorough questioning of it. The resolution of this conflict—one between an assertion that a statement was made and contrary inferences that say it was not—has given the court much difficulty. The witnesses were equally credible; the competing proof equally sparse. Serious consideration was given to reopening the record for further testimony on the point but, in the final analysis, it was concluded that each side had spoken to the best of its recollection. The Government's account of events was accepted because, as the record stood, it was judged to be closer to the history of past events.

immediately drawn is this: the Government's failure to have paid timely, and, in full, the first principal payment due under the settlement agreement was a breach of contract. At the time that payment became owing neither of the contingencies subsumed in Article 8 had been realized. Appropriated monies then were available to the agency, as was plainly evidenced by the reprogramming notice that had been transmitted to the congressional committees, and there had occurred no legislative action of a character sufficient to *prevent* the Administrator from paying. All that had occurred to that point was congressional disapproval of the intended reprogramming and that disapproval, for the reasons earlier explained, can have no bearing upon the parties' rights and obligations under the settlement agreement.[9]

The contractor's entitlement to the second principal payment is another matter. That payment was not due until the end of January 1974, some three weeks after the enactment of Pub.L.No. 93–245, 87 Stat. 1071. The issue is whether this statute, now 31 U.S.C. § 700d (1976), has any bearing upon the parties' rights and obligations under the settlement agreement. The answer is that it does.

The statute (the text of which appears in an earlier part of this opinion) narrowed the agency's authority with respect to construction contract settlements by imposing upon all such settlements, when exceeding $1,000,000 in amount, the dual requirements

of an independent audit as to reasonableness and appropriateness of expenditures and specific recognition in an appropriations act.

■ But of more immediate importance to this case than the restrictions of authority announced by the statute is the fact that these restrictions were meant to apply, not just prospectively, but to existing appropriations as well. This is evident from the act's language: its requirements are addressed to "funds appropriated in this or any other Appropriation Act for any fiscal year." The language, being so plainly all inclusive, must displace that general presumption which accords to Congress an intent that statutes are to have a prospective application only. *Sea-Land Service, Inc. v. United States,* 204 Ct.Cl. 57, 78, 493 F.2d 1357, 1369, *cert. denied,* 419 U.S. 840, 95 S.Ct. 69, 42 L.Ed.2d 67 (1974).

■ Any doubt as to the correctness of this reading would have to be relinquished in light of the legislative history. This clearly reveals that Congress intended to bring the instant settlement within the reach of the statute by restricting the use of the funds out of which that settlement was to be paid.[10] Since Congress has the power to amend an appropriations act, *United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940); *Los Angeles v. Adams,* 556 F.2d 40, 48–49 (D.C.Cir. 1977), and did so here, the consequences must be as the statute directs: appropriated funds shall not be used in the payment

---

**9.** The Government's brief devotes much attention to the fact that the spending restraints imposed by the Anti-Deficiency Act relate not only to the amounts that have been appropriated but also to the administrative divisions made of such appropriations. The point of the argument seems to be that, since no monies had initially been set aside for payment of the settlement amount, the agency could not thereafter honor the agreement, at least not without running afoul of the Anti-Deficiency Act. This argument is completely without merit. Administrative barriers of the sort which the Government's argument raises are purely of an in-house accounting nature and, as such are irrelevant to any determination respecting the availability of appropriated funds. So long as appropriations are sufficient in overall amount to meet obligations, it is the agency's duty to

remedy any shortfall that might exist in a particular project account. *See Berends v. Butz,* 357 F.Supp. 143 (D.Minn.1973).

**10.** The several confirming references include: (i) discussion of the bill on the floor of the Senate, 119 Cong.Rec. 41054, 41057–41064 (1973); (ii) conference committee action on the bill, H.R.Rep. No. 93–736, 93d Cong., 1st Sess. (1973); and (iii) Hearings on Department of Housing and Urban Development, Space, Science, Veterans, and Certain Other Independent Agencies Appropriations for Fiscal Year 1975 Before the Subcomm. on HUD-Space-Science-Veterans of the Senate Comm. on Appropriations, 93d Cong., 2d Sess. 363, 389 (March 22, 1974).

of a construction contract settlement exceeding $1,000,000 in the absence of a specified audit and recognition of the settlement in an appropriations act. By virtue of these substantive limitations on the use of appropriated funds, the Veterans Administration was prevented from paying the remainder of the amount due on the settlement.

The question that remains is whether, notwithstanding these statutory restrictions, the resulting failure of a second payment is actionable in this court. It is not. The restraint on the agency's spending authority that took place was precisely the sort of condition to which the parties had made their settlement agreement subordinate, namely, an affirmative action by the Congress that would prevent the Administrator from paying. "[W]here * * * liability rests wholly upon the authority of an appropriation they must stand and fall together, so that when the latter is exhausted the former is at an end * * *." *Shipman v. United States*, 18 Ct.Cl. 138, 147 (1883).

Cases such as *Corliss Steam-Engine Co. v. United States*, 10 Ct.Cl. 494 (1874), *aff'd*, 91 U.S. 321, 23 L.Ed. 397 (1875), and *Seatrain Lines, Inc. v. United States*, 99 Ct.Cl. 272 (1943), dictate no different conclusion. Those cases, like the one at hand, involved an executive department's inability to pay a contract amount because of disabling language in a later-passed appropriations act. But, unlike this case, the right to the payments there involved was absolute; not conditional. Hence, a breach of contract action survived the expenditure restrictions that had been placed upon the agency's appropriations. The rationale of these decisions is that a contract of the United States, if valid when made, is to be governed by the same rules that apply to contracts between private parties. Here, however, the Government's liability was conditioned upon the continuing availability of appropriated funds *to the agency*. The risk perceived in this contingency having come about, the Government's liability, by the terms of the agreement, was thereby extinguished.

It should be made clear that what has been said concerning the unavailability of appropriated funds applies only to the second principal payment that was due to the contractor under the settlement agreement. Only as to that payment is the Government's liability discharged. As to the first principal payment, however, appropriated funds were available at the time that payment fell due. To have paid only $6 million on January 3, 1974, when, in fact, the settlement agreement had specified an $8 million payment by December 10, 1973, was a violation of the Government's contract obligation. The occurrence of those later events, the results of which have here been held to excuse the Government from any further contract liability, have no bearing upon the preceding breach and the damages entitlement that flows therefrom. The right to the first payment was a vested right. Restatement (Second) of Law, Contracts § 281, Comment a (Tent.Draft No. 9, 1974); Restatement of Law, Contracts § 608, Comment d (1932).

Accordingly, the contractor is entitled, first of all, to a judgment for the principal amount remaining due on the first payment, namely, $2 million. Additionally, since the settlement agreement provided that interest at the rate of 9.75 percent per annum would accrue on any principal amounts not paid when due, the contractor is therefore also entitled to interest, first, for the failure to have been paid on time; second, for the later failure to have been paid in full. By way of interest then, the contractor is entitled to the contract-specified rate, 9.75 percent per annum, on $6,000,000, for the period from December 10, 1973 (the due date), until January 3, 1974 (the date of partial payment), and, on the balance of the first payment still owing ($2,000,000), from December 10, 1973, until the date said amount is finally paid.

A final consequence of the statute that needs to be addressed concerns the Government's position that the contractor should be obliged to honor the settlement agreement by submitting to the audit called for by the statute and, by such action, facilitating the future availability of appropriated funds.

This position has many problems; not the least among these is that the form of audit contemplated by the statute—examination of the reasonableness and appropriateness of expenditures—introduces the very type of audit which the contractor had rejected in the first place. To now insist upon adherence to these altered audit standards would, on the facts of this case, be equivalent to imposing upon the contractor an agreement that was never made. This the Government cannot do. Absent the reservation of such a right, the Government cannot enforce the benefits of the settlement agreement against the contractor, and, at the same time, vary its own obligation thereunder. *Chicago & Northwestern Ry. v. United States*, 104 U.S. 680, 684, 26 L.Ed. 891 (1881).

The limitations on spending authority that now must govern the agency's actions under 31 U.S.C. § 700d (1976), serve also to discharge the contractor from any further obligations under the settlement agreement. Restatement (Second) of Law, Contracts §§ 281, 284 (Tent. Draft No. 9, 1974).

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover the sum of $2,000,000, plus interest on that amount at the contract-specified rate of 9.75 percent per annum from December 10, 1973, until the date payment is made and that plaintiff is also entitled to interest only, on the sum of $6,000,000, at 9.75 percent per annum from December 10, 1973 until January 3, 1974.

The judgment entered herein shall be without prejudice to the parties' rights to pursue further relief in an appropriate forum in connection with the contract claims underlying the settlement agreement brought into issue in this case. If in further proceedings the defendant is found liable on the underlying contract claims in an amount greater than the non-interest amount of the court's judgment, in that event only the non-interest portion of the court's judgment, not the interest portion, shall be treated as an offset against such additional liability. The court does not pass on the question of whether, if the amount for which defendant is held liable in further proceedings is less than the principal amount of the settlement, the defendant shall have the right to sue plaintiff for the excess or to collect the excess by other methods.

Except as above provided and contemplated, all obligations contemplated by the settlement agreement are forever discharged.