**NORTON SOUND HEALTH CORP.,**
Plaintiff—Appellant,

v.

Tommy G. THOMPSON, et al.,
Defendants—Appellees.

No. 01–35804.
D.C. No. CV–00–00080–HRH.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 2002.

Decided Feb. 6, 2003.

Before B. FLETCHER, ALARCÓN,
and GRABER, Circuit Judges.

## MEMORANDUM*

Norton Sound Health Corporation
("Norton Sound"), a consortium of 20 Alas-

* This disposition is not appropriate for publica-

tion and may not be cited to or by the courts

ka Native Villages in the Bering Strait region, appeals from the district court's grant of summary judgment in favor of the Secretary of Health and Human Services and the Director of the Indian Health Service (collectively the "IHS"). Because we find that there are genuine issues of material fact in dispute, we reverse.

## I.

Because the parties are familiar with the facts of this case, we discuss them only as necessary to explain our decision. Congress sought to encourage Indian tribes to take over the provision of health care services for their people. *See* 25 U.S.C. §§ 450, 450a; 25 C.F.R. § 900.3. Congress also required the IHS to reimburse tribes and tribal organizations for the cost of administrative services associated with providing health care services. *See* 25 U.S.C. § 450f(a)(1). The IHS created and maintained three "pools" of funds to reimburse different contract support costs: One pool, called the Indian Self–Determination ("ISD") fund, was for administrative costs associated with new and expanded health service contracts. *See* IHS Circular No. 96–04, at 9.

The IHS and Norton Sound reached an agreement for Norton Sound to provide health care for twenty Alaska native villages. But, for whatever reasons, they disagreed about the amount of money Norton Sound should receive to cover the initial administrative costs associated with providing health care services. After considerable negotiation, the IHS and Norton Sound entered into a settlement agreement: $349,612 was due Norton Sound, and Norton Sound agreed to take a place

in the "queue" to be paid from the ISD fund as money became available.[1] This agreement was recognized and reaffirmed in annual funding agreements ("AFA") in 1997, 1998, and 1999.

By 1999, Norton Sound was close to the head of the "queue." But, suddenly, circumstances changed: for fiscal year 1999, Congress did not segregate a specific amount of its lump-sum appropriation for health care to be allocated for ISD-funded contract support costs, but instead increased the lump sum it appropriated to cover contract administration costs by $35 million.[2] The IHS, however, claimed that it only owed Norton Sound $75,031 instead of $349,612, and informed the consortium that this debt would not be paid in 1999. The IHS instead decided to spread the additional $35 million that Congress appropriated among the organizations in the ISD queue to bring the level of reimbursement to a standard and uniform rate of 80.42% of requests.

## II.

We find that on the evidence presented, Norton Sound raised triable issues with regard to (1) whether its claim in 1999 was conditioned on specific congressional appropriations to the ISD fund; and (2) whether the IHS in fact allocated part of the increased lump-sum appropriation to the ISD fund in 1999.

### A. *The 1999 Annual Funding Agreement Is Ambiguous*

■ We turn first to the question of whether the 1999 AFA conditioned Norton Sound's claim on specific congressional appropriations to the ISD find. Our stan-

---

of this circuit except as provided by Ninth Circuit Rule 36–3.

1. The queue system was mandated by IHS Circular No. 96–04.

2. During the entire fiscal year 1999, the allocation of this increase was governed by IHS Circular No. 96–04's pooling system.

dard of review requires us to decide whether the 1999 AFA is clear and unambiguous. We hold it is not. "[T]he determination of whether contract language is ambiguous is a question of law." *O'Neill v. United States*, 50 F.3d 677, 682 (9th Cir.1995). If a contract is ambiguous, its interpretation presents a mixed question of law and fact. *Libby, McNeill & Libby v. City Nat'l Bank*, 592 F.2d 504, 512 (9th Cir.1978); *see also Dale v. Preg*, 204 F.2d 434, 435 (9th Cir.1953) (if a contract is ambiguous, its meaning is a question of fact as to which extrinsic evidence can be received in aid of its interpretation). Thus, summary judgment is proper in a contract case only if the contract or the contract provision in question is unambiguous. *Castaneda v. Dura–Vent Corp.*, 648 F.2d 612, 619 (9th Cir.1981).

The 1999 AFA between the IHS and Norton Sound provided, in pertinent part, as follows:

> *Indirect/Contract Support.* Pursuant to section 106(a)(2) of the Indian Self–Determination Act, NSHC [Norton Sound] shall receive contract support as defined in sections 106(a)(2) and (3). As stated in section 106(a)(2) NSHC shall receive contract support only for costs that are not normally carried out by the Secretary in her direct operation of the program or are provided by the Secretary in support of the contracted program from resources other than those under compact. The amount for contract support due from the Indian Self Determination Fund for FY [fiscal year] '96 and for FY '97 is $349,612. The parties acknowledge that the IHS intends to pay contract support costs according to IHS Circular 96–4. Nothing in this provision shall be interpreted to waive NSHC's right to be paid the contract support costs to which it is entitled in accordance with section 106(a)(2) of the Indian Self–

Determination and Education Assistance Act.

In addition, a footnote to the financial summary of the agreement that was appended to the AFA states "Line 25—subject to ISD appropriations." Although line 25 specifically addresses catastrophic health care costs, it also may be read to address line 26 of the financial summary that indicates that $349,612 is due Norton Sound for contract support costs.

The IHS urges that we read this provision to mean that payment to Norton Sound was conditioned on Congress's appropriating a specific amount to the ISD *fund* for fiscal year 1999. The word "fund," however, nowhere appears in the footnote, and there is no other indication in the contract that the parties definitively intended to condition Norton Sound's right to recovery so narrowly. While the IHS's reading of the footnote is plausible, it is not textually compelled, and another plausible meaning of the footnote is that payment of the $349,612 was contingent on Congress's appropriating funds that could be used for ISD purposes. Thus, we conclude that the meaning of the provision is unclear and ambiguous. *See Castaneda*, 648 F.2d at 619 (provision of a contract is ambiguous if it is reasonably susceptible of more than one construction or interpretation). This ambiguity, in turn, creates a question of fact as to the parties' intent, and summary judgment is inappropriate.

In addition, even if it were proper to read the footnote to make Norton Sound's right to payment in 1999 contingent on congressional appropriations for the ISD *fund*, summary judgment still would be improper because Norton Sound has adduced evidence that, when viewed in the light most favorable to it, indicates that Congress made "an ISD appropriation" for 1999. The appropriation bill for the relevant period provides:

Provided further, That, notwithstanding any other provision of. law, of the amounts provided herein, not to exceed $203,781,000 shall be for payments to tribes and tribal organizations for contract or grant support costs associated with contracts, grants, self-governance compacts or annual funding agreements between the Indian Health Service and a tribe or tribal organization pursuant to the Indian Self–Determination Act of 1975, as amended, prior to or during fiscal year 1999.

Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub.L. No. 105–277, § 152 (1998). That is, Congress appropriated $203,781,000 including an extra $35 million, to be used to reimburse organizations such as Norton Sound for their contract support costs. These costs included—as specified by the Indian Self–Determination Act—costs associated with taking over the administration of health care services.

Congress's failure to specify that part of the appropriation was to be directed to the ISD fund itself, on summary judgment, as a matter of law cannot be read to have extinguished that fund in 1999.[3]

## B. Allocation of Money to the ISD Fund

■ We turn next to the question of whether the IHS in fact allocated part of the increased lump-sum appropriation to the ISD fund in 1999. The issue is not whether the IHS used a distribution method in 1999 that differed from the "queue" system that it had used in earlier years, but whether money that was used to reimburse contract support costs was· ISD money.

Norton Sound presented evidence that would allow a trier of fact to find that the IHS distributed the funds as ISD money. The IHS's distribution sheets indicate that

---

**3.** The dissent's implication that Congress compelled the IHS in 1999 to abandon the methodology for distributing ISD funds delineated by IHS Circular No. 96–04 is mistaken. Congress clearly indicated that it declined to mandate any changes to the IHS contract support cost distribution system for fiscal year 1999, but awaited the Administration's proposals for changes to the system for fiscal year 2000. The House and Senate Conference Committee stated:

The conference agreement does not include statutory language mandating a pro-rata [sic] distribution of contract support costs across all Service self-determination contracts and self-governance compacts. This language was included in both the House and Senate bills but has been dropped because of concerns expressed by tribal organizations and many individual tribes. The Committees remain convinced that the current distribution methodology employed by the Service for contract support costs is inequitable and fiscally unsound. The Committees' proposal for a pro-rata distribution, in combination with a one-year moratorium on new contacts and compacts and additional funding for exist-

ing contracts and compacts, would have provided a permanent solution to the problem.

The Committees have added more than $35 million to the Administration's budget request to address the inequity in the distribution of contract support cost funding in fiscal year 1999. The Committees direct the Service, in cooperation with the tribes, to remedy this inequity in the fiscal year 2000 budget request. The remedy cannot be a large infusion of additional funding for contract support costs at the expense of either critical health programs or critical construction needs of the Service. Further, the Committees note that the one-year moratorium on new contracts and compacts cannot be extended indefinitely. The Committees believe strongly that an acceptable permanent solution to the contract support cost distribution inequity must be a part of the fiscal year 2000 budget request from the Administration.

*Conference Report on H.R. 4328, Making Omnibus Consolidated and Emergency Supplemental Appropriations for Fiscal Year 1999,* 144 Cong. Rec. H11044, H11382 (daily ed. Oct. 19, 1998).

funds were distributed to tribes and tribal organizations for the uses defined by the "pools" of money for contract support costs. The IHS's contract support cost data report for 1999 consistently adopted the terminology of ISD funds and distinguished between tribes in the ISD fund queue and others.

The IHS urges us to conclude that all of the agency's specific references to "Indian Self–Determination Funds" merely were meant to differentiate the tribes that were in the ISD queue from those that were not. At summary judgment, however, any ambiguity in the meaning of the sheets must be resolved in favor of Norton Sound and against the IHS.

### III.

In sum, we hold that the district court committed reversible error when it determined that there were no genuine issues of material fact in dispute and that summary judgment in favor of the IHS was proper. We reverse the entry of judgment in favor of the IHS and remand to the district court for trial.

### REVERSED and REMANDED

ALARCÓN, Circuit Judge, dissenting.

I respectfully dissent. The district court did not err in granting IHS's motion for summary judgment because Congress did not appropriate any money to the ISD Fund in fiscal year 1999.

### I

Norton Sound first contends that its right to receive the settlement amount of $349,612 was not contingent on Congress's appropriation of funds to the ISD Fund. The plain language of the 1999 AFA belies this argument. The 1999 AFA provides that:

> The amount for contract support due *from the Indian Self Determination Fund* for FY '96 and FY '97 is $349,612. The parties acknowledge that the IHS intends to pay contract support costs according to IHS Circular [96–04].

Admin. R. at 436 (emphasis added). An appendix to the 1999 AFA reflects that the $349,612 was to come from the "no year" appropriations account and, more specifically, the "Indian Self Determ[ination]" line item. *Id.* at 461A. A footnote to this line item states that payment of the $349,612 was "subject to ISD appropriations." *Id.* Thus, the language of the 1999 AFA made payment of the $349,612 contingent on a specific earmarked congressional appropriation to the ISD Fund.

The history of the appropriations relating to contract support costs also demonstrates that Norton Sound's right to receive the $349,612 was conditioned on Congress's appropriation of sufficient funds to the ISD Fund. Congress established the ISD Fund in fiscal year 1988 to earmark specific funds for the additional contract support costs that result when tribes contract for new and expanded programs. *See* Continuing Appropriations, Fiscal Year 1988, Pub. L. No. 100–202, 101 Stat. 1329, 1329–245 (1987) (earmarking $2.5 million "for the establishment of an Indian Self–Determination Fund"). From fiscal year 1994 to fiscal year 1998, Congress required the IHS to set aside $7.5 million of its lump-sum appropriation to be used for the ISD Fund. *See* Department of the Interior and Related Agencies Appropriations Act, 1994, Pub. L. No. 103–138, 107 Stat. 1379, 1408 (1993) (earmarking $7.5 million for the ISD Fund for fiscal year 1994); Department of the Interior and Related Agencies Appropriations Act, 1995, Pub.L. No. 103–332, 108 Stat. 2499, 2528 (1994) (same, fiscal year 1995); Omnibus Consolidated Rescissions and

Appropriations Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321, 1321–189 (1996) (same, fiscal year 1996); Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104–208, 110 Stat. 3009, 3009–213 (1996) (same, fiscal year 1997); Department of the Interior and Related Agencies Appropriations Act, 1998, Pub.L. No. 105–83, 111 Stat. 1543, 1582 (1997) (same, fiscal year 1998).

In fiscal year 1999, Congress did not earmark any appropriations for the ISD Fund. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub.L. No. 105–277, 112 Stat. 2681, 2681–278 (1998). Instead, Congress imposed a moratorium on the IHS from entering into any new or expanded contracts and set a cumulative cap of $203,781,000 on all contract support costs. *Id.* at 2681–279. Congress had capped cumulative contract support costs in fiscal year 1998 as well. Pub.L. No. 105–83, 111 Stat. 1543, 1583. The fiscal year 1999 cumulative cap represented a $35 million increase over the fiscal year 1998 cap.

Congress directed the IHS to use the $35 million increase to lessen the disparities in contract-support-cost funding among all contracting tribal organizations. *Conference Report on H.R. 4328, Making Omnibus Consolidated and Emergency Supplemental Appropriations for Fiscal Year 1999,* 144 Cong. Rec. H11044, H11382 (daily ed. Oct. 19, 1998). The conference report stated that "[t]he Committees remain convinced that the current distribution methodology employed by the [Indian Health] Service for contract support costs is inequitable and fiscally unsound." *Id.* The IHS was directed "to address the inequity in the distribution of contract support cost funding in fiscal year 1999." *Id.*

Norton Sound's contractual right to receive the $349,612 payment was expressly contingent on an appropriation for the ISD Fund. As no such appropriation was made in fiscal year 1999, the IHS had no obligation to pay Norton Sound the $349,612.

Norton Sound maintains that the 1999 AFA did not make payment of the $349,612 contingent on appropriations earmarked for the ISD Fund by Congress. Norton Sound points to the 1999 AFA's incorporation of the provisions in Circular No. 96–04 and contends that the ISD Fund included "funds identified by the IHS from funds available for that purpose." Circular No. 96–04 indeed provides that tribal organizations "on the [ISD Fund] priority list will remain on the priority list and be considered in priority order when funding is made available by appropriation *or reprogramming.*" Admin. R. at 202 (emphasis added). Nevertheless, the 1999 AFA explicitly makes payment of the $349,612 "subject to ISD *appropriations.*" *Id.* at 461A (emphasis added). "Appropriation" is a term of art, defined as "[a] legislative body's act of setting aside a sum of money for a public purpose." Black's Law Dictionary 98 (7th ed.1999). Only Congress can make an appropriation. *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law...."). The phrase "subject to ISD appropriations" in the 1999 AFA removes the possibility that payment of the $349,612 could be triggered by the IHS "reprogramming" general contract-support-cost funds to the ISD Fund.

II

Norton Sound also asserts that adequate funds were available to the IHS to pay the $349,612. Norton Sound contends that the record "shows that the IHS allocated the majority of the $35 million increase in contract support funding to the ISD Fund for distribution to tribal contracts with new or expanded contracts." The record,

however, does not support Norton Sound's contention that the IHS reprogrammed any of the $35 million increase to the ISD Fund.

In response to Congress's instruction to "address the inequity in the distribution of contract support costs in fiscal year 1999," the IHS held numerous meetings with tribal representatives to determine the most appropriate method to distribute the $35 million contract-support-cost increase. Following these meetings, the IHS abolished its queue system and adopted a "bottom-up" methodology to distribute the $35 million increase. Under this system, the IHS reviewed all contract-support-cost shortfall data from all contracting tribal organizations (i.e., tribes that were in the ISD Fund queue *and* those that were not). Based on this review, the IHS recalculated contract-support-cost needs for all tribal organizations. Under the bottom-up methodology, tribes that were receiving at least 80.42% of their total contract support costs received no additional funding. Tribes receiving less than 80.42% of their total contract support costs were brought up to the 80.42% floor by expenditure from the $35 million.[1]

In using the bottom-up methodology, most of the $35 million went to tribes that had requests pending in the ISD queue. The rest went to tribes that were not in the queue. The IHS's distribution sheets make reference to "ISD" and "FY 1999 Indian Self–Determination Funds," but when read in the context of the IHS's overall contract-support-cost shortfall summary tables, it appears that these references are merely to differentiate those tribes that were in the queue from those tribes that were not in the queue. In sum, the record does not reveal that the IHS reprogrammed any of the $35 million in-

crease to the ISD Fund when it used the bottom-up allocation method.

The record reveals that Norton Sound was treated fairly. The IHS applied the bottom-up calculation to Norton Sound in the same manner as it did with all the other contracting tribes. Applying the bottom-up methodology, the IHS determined that Norton Sound was receiving 84.7% of its total contract support costs. Thus, Norton Sound did not receive any of the $35 million that had been appropriated for contract-support-cost shortfalls in fiscal year 1999. In the process, the IHS reviewed Norton Sound's ISD Fund request of $349,612, recalculated it to $75,031, and used this amount in making its determination that Norton Sound was receiving 84.7% of its total contract support costs. If the IHS had used the $349,612 amount instead, Norton Sound's total contract support costs would have been funded at 80.86%, which still would have been above the 80.42% floor. Because of the lack an appropriation, funding was not available in 1999 either for the $349,612 Norton Sound alleges it is entitled to or for the recalculated amount of $75,031.

### III

Norton Sound contends that, even if "the IHS did not otherwise allocate adequate funds to the ISD Fund in FY 1999 to pay Norton Sound, the IHS had an obligation to make such funds available." Norton Sound cites *Blackhawk Heating & Plumbing Co. v. United States*, 224 Ct.Cl. 111, 622 F.2d 539 (1980) (per curiam), to support this contention. In *Blackhawk*, the Veterans Administration ("VA") sought to avoid paying a *litigation* settlement on the ground that it had no specific funds set aside for such a payment and that pay-

---

1. The IHS eventually adopted a new allocation policy based on the bottom-up methodology, which was published in January of 2000 as IHS Circular No. 2000–01.

ment would therefore violate the Anti–Deficiency Act. *Id.* at 548, 552 n. 9. Although the VA had ample money in its lump-sum appropriation to fund the litigation settlement in full, the VA claimed that the agency's administrative allocation of its funding created an account that had insufficient funds to cover this particular settlement amount. *Id.* at 552. The court rejected this argument and observed that, "[s]o long as appropriations are sufficient in overall amount to meet obligations, it is the agency's duty to remedy any shortfall that might exist in a particular project account." *Id.* at 552 n. 9.

Norton Sound maintains that *Blackhawk* "demonstrates that where there is a shortfall in an objective for which the agency has an obligation, *the agency has a duty to shift, or reprogram funds from other objectives within a lump-sum appropriation to remedy that shortfall.*" Appellant's Br. at 50 (emphasis in original). Norton Sound's reliance on *Blackhawk* is misplaced. In *Blackhawk,* the VA had sufficient funds in its lump-sum appropriation to pay the litigation settlement. *Id.* at 552. In contrast, here the record shows that the overall contract-support-cost funding needs for all tribal organizations far outstripped the cumulative cap that Congress placed on contract-support-cost funding for fiscal year 1999. The record reveals that, in fiscal year 1999, the overall contract-support-cost needs for all tribes were $242,985,021, which was $39,204,021 more than the $203,781,000 cumulative cap set by Congress.

The ISDEAA explicitly states that "[t]he amounts of such [self-determination] contracts shall be subject to the availability of appropriations." 25 U.S.C. § 450j(c). The ISDEAA also broadly provides that all contract funding under the ISDEAA "is subject to the availability of appropriations and *the Secretary is not required to reduce*

*funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization.*" *Id.* § 450j–1(b) (emphasis added). No matter how the IHS distributed the $35 million, some tribal organizations would not have been paid their full contract amount. The record shows that, to fund fully the contract-support-cost needs of all tribes, an additional appropriation of $35,043,961 above the $35 million increase would have been required. The record also shows that over 100 other tribes were receiving a smaller percentage of their overall contract-support-cost needs than Norton Sound. The IHS did not have an obligation to use a part of the $35 million to pay Norton Sound's claim. Rather, the IHS had a congressional mandate to use the $35 million in a manner that would reduce the inequity in overall contract-support-cost funding among all tribes.

My conclusion that the IHS had no obligation to pay Norton Sound the $349,612 in fiscal year 1999 is supported by our recent decision in *Shoshone–Bannock Tribes v. Secretary, Department of Health & Human Services,* 279 F.3d 660 (9th Cir.2002). In *Shoshone–Bannock,* a tribe operating under a self-determination contract filed suit against the IHS after it refused to pay the tribe its contract support costs in fiscal year 1996. *Id.* at 663–64. The IHS contended that the tribe was not at the head of the queue and that there were insufficient funds to pay the tribe's contract support costs from the $7.5 million that Congress had earmarked to the ISD Fund that fiscal year. *Id.* at 664. The tribe argued that "the way the appropriation law is worded, the [IHS] has to provide the money for contract support costs, either out of that [ISD Fund] appropriation, or out of other money appropriated to the [IHS] if the part of the [IHS] appropriation designated for contract support costs is exhausted." *Id.* We deter-

mined that the ISDEAA's text, making all contract funding subject to the " 'availability of appropriations,' and the clear statement that this limitation applies 'notwithstanding any other provision in this Act,' " evidenced Congress's intent to "exclude[ ] the possibility of construing the contract support costs provision as an entitlement that exists independently of whether Congress appropriates money to cover it." *Id.* at 664–65 (footnotes omitted). We held in *Shoshone–Bannock* that "[t]here is simply no Indian Health Service obligation to fund contract support costs beyond the appropriations made available for that purpose." *Id.* at 667.

In the present case, Norton Sound and the IHS agreed that $349,612 was to be paid from the ISD Fund. In fiscal year 1999, however, Congress did not appropriate *any* funds to the ISD Fund. Following our reasoning in *Shoshone–Bannock*, the IHS did not have an obligation to reprogram to the ISD Fund any of the $35 million increase in its general contract-support-cost appropriations in order to pay Norton Sound the $349,612.

I would affirm the order granting summary judgment in favor of IHS.

---

* The Honorable Daniel M. Friedman, Senior United States Circuit Judge for the Federal Circuit, sitting by designation.

---

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.