**Tommy G. THOMPSON, Secretary of Health and Human Services, Appellant,**

v.

**CHEROKEE NATION OF OKLAHOMA, Appellee.**

No. 02–1286.

United States Court of Appeals, Federal Circuit.

July 3, 2003.

---

Jeffrica Jenkins Lee, Attorney, Appellate Staff, Civil Division, Department of Justice, of Washington, DC, argued for appellant. With her on the brief was Robert D. McCallum, Jr., Assistant Attorney General; and Barbara C. Biddle, Attorney.

Lloyd Benton Miller, Sonosky, Chambers, Sachse, Miller & Munson, of Anchorage, AK, argued for appellee. With him on the brief was Melanie B. Osborne.

Michael P. Gross, M.P. Gross & Associates, P.C., of Santa Fe, NM for amicus curiae Ramah Navajo Chapter. Of counsel on the brief was Carl Bryant Rogers, Roth, VanAmberg, Rogers, Ortiz, Fairbanks & Yepa, LLP, of Santa Fe, NM.

Marsha Kostura Schmidt, Hobbs, Straus, Dean & Walker, LLP, of Washington, DC, for amicus curiae Alamo–Navajo School Board, et al.

Shelby Settles, National Congress of American Indians, of Washington, DC, for amicus curiae National Congress of American Indians.

Before CLEVENGER, SCHALL, and DYK, Circuit Judges.

DYK, Circuit Judge.

This case raises the question of whether the Secretary of the Department of Health and Human Services ("the Secretary") breached his contracts with the Cherokee Nation of Oklahoma ("the appellee"), entered into pursuant to the Indian Self Determination and Education Assistance Act, 25 U.S.C. §§ 450–450n ("ISDA").

The Department of the Interior Board of Contract Appeals ("the Board") determined that the Secretary breached his contracts for the fiscal years 1994, 1995, and 1996, by failing to pay the full indirect costs of administering federal programs. *In re Cherokee Nation of Okla.,* IBCA Nos. 3877–79, 99–2 B.C.A. (CCH) ¶ 30,462, 1999 WL 440045 (Interior B.C.A.1999) (*"Cherokee I"*); *reconsideration denied, In re Cherokee Nation of Okla.,* IBCA Nos. 3877–79, 01–1 B.C.A. (CCH) ¶ 31,349, 2001 WL 283245 (Interior B.C.A.2001) (*"Cherokee II"*). By statute, the Secretary's obligation to pay was "subject to the availability of appropriations," and the Secretary was "not required to reduce funding for programs, projects, or activities serving a tribe" in order to make the payments. 25 U.S.C. § 450j–1(b) (2000).

We hold that there were available appropriations to pay the appellee its full indirect costs, because there were no statutory caps on funding in the appropriations acts for the relevant fiscal years, and that the Secretary has not shown that full payment would require the Secretary "to reduce funding for programs, projects, or activities serving [another] tribe."

We therefore affirm the judgment of the Board.

## BACKGROUND

### I

Before the enactment of the ISDA in 1975, service programs benefiting the Indian tribes were operated almost exclusively by the federal government. The ISDA was designed to make a major change in this approach. Congress was apparently concerned that:

the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of

Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and it has denied to the Indian people an effective voice in the planning and implementing of programs for the benefit of Indians which are responsive to the needs of the Indian community.

S.Rep. No. 93–762, at 12 (1974).

The ISDA had the stated purpose of "permit[ting] an orderly transition from Federal domination of programs for and services to Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." ISDA, Pub.L. No. 93–638, § 3(b), 88 Stat. 2203, 2204 (1975) (codified as amended at 25 U.S.C. § 450a(b) (2000)). In order to transfer the programs from federal to tribal control, the statute required the Secretary to enter into contracts with the tribes, under which the tribes would administer the previously federal programs. The statute provided, "[t]he Secretary of the Interior is directed, upon the request of any Indian tribe, to enter into a contract or contracts with any tribal organization of any such Indian tribe to plan, conduct, and administer programs, or portions thereof." *Id.* § 102(a), 88 Stat. at 2206 (codified as amended at 25 U.S.C. § 450f(a)(1) (2000)).

The statute required that the tribes receive the full amount of federal funds that the programs would have received had the Secretary continued to operate them directly: "The amount of funds provided under the terms of contracts entered into pursuant to sections 102 and 103 shall not be less than the appropriate Secretary would have otherwise provided for his direct operation of the programs or portions thereof." *Id.* § 106(h), 88 Stat. at 2211 (codified as amended at 450j–1(a) (2000)).

This amount is often called the "secretarial amount."

By 1987, many tribes were "undertaking their own education, health, and job-training programs." S.Rep. No. 100–274, at 2 (1987). The transition, however, was not without problems. The tribes complained that they were not receiving amounts sufficient to cover the full administrative costs of the programs. *See generally, Babbitt v. Oglala Sioux Tribal Pub. Safety Dep't,* 194 F.3d 1374, 1380–84 (Fed.Cir.1999) (Gajarsa, J., concurring). One of the reasons for this deficiency apparently was that the "secretarial amount" required to be paid by section 106(h) of the original statute included only the funds that the Secretary would have provided to operate the programs directly, but did not include additional administrative costs that the tribes incurred in their operation of the programs, which the Secretary would not have directly incurred (for example, the cost of annual financial audits, or the cost of administrative resources that the Secretary could draw from other government agencies). At an oversight hearing, "witnesses explained that the failure of Federal agencies to reimburse tribes for the cost of program operation has resulted in a tremendous drain on tribal financial resources." S.Rep. No. 100–274, at 7 (1987). The committee concluded that:

> [p]erhaps the single most serious problem with implementation of the Indian self-determination policy has been the failure of the Bureau of Indian Affairs and the Indian Health Service to provide funding for the indirect costs associated with self-determination contracts. The consistent failure of federal agencies to fully fund tribal indirect costs has resulted in financial management problems for tribes as they struggle to pay for federally mandated annual single-agency audits, liability insurance, financial management systems, personnel systems,

property management and procurement systems and other administrative requirements. Tribal funds derived from trust resources, which are needed for community and economic development, must instead be diverted to pay for the indirect costs associated with programs that are a federal responsibility. *It must be emphasized that tribes are operating federal programs and carrying out federal responsibilities when they operate self-determination contracts. Therefore, the Committee believes strongly that Indian tribes should not be forced to use their own financial resources to subsidize federal programs.* *Id.* at 8–9 (emphasis added).

Partly in response to this problem, Congress passed the Indian Self–Determination Amendments of 1988, Pub. Law. No. 100–472, 102 Stat. 2285 (codified as amended at 25 U.S.C. §§ 450–450n (2000)) (1988), which required that the Secretary provide funds for the full administrative costs to the tribes. The amended statute provides, "[t]here *shall be added* to the [secretarial amount] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management." 25 U.S.C. § 450j–1(a)(2) (2000) (emphasis added).[1] The statute also provides, "[t]he amount of funds required by subsection (a) of this section (1) *shall not be reduced* to make funding available for contract monitoring or administration by the Secretary," and "(3) *shall not be reduced* by the Secretary to pay for Federal functions." *Id.*

§ 450j–1(b) (emphases added). The committee explained, "[a] new section 106 is added to the Act to clarify provisions for funding self-determination contracts, including indirect costs. This section protects contract funding levels provided to tribes, and prevents the diversion of tribal contract funds to pay for costs incurred by the Federal government." S.Rep. No. 100–274, at 30.

Under the amended statute, there are only narrow exceptions to this obligation of the government to pay full contract support costs. One of these exceptions states that "[n]otwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations." 25 U.S.C. § 450j–1(b) (2000) ("availability clause"). Another exception provides that "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization." *Id.*

## II

Beginning in 1983, the appellee, the Cherokee Nation of Oklahoma, entered into contracts with the Secretary under the ISDA, to operate hospitals, health clinics, dental services, mental health programs, and alcohol and substance abuse programs, all of which were formerly operated by the Secretary. This case concerns indirect costs under the contracts for fiscal years 1994, 1995, and 1996. Indirect costs are "administrative or other expense[s] related to the overhead incurred by the trib-

---

1. "Contract support costs" are defined as:

 an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which

 (A) normally are not carried on by the respective Secretary in his direct operation of the program; or
 (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.
 25 U.S.C. § 450j–1(a)(2) (2000).

al contractor in connection with the operation of the Federal program." 25 U.S.C. § 450j–1(a)(3)(ii) (2000).

On June 30, 1993, the appellee and the Secretary agreed to a "Compact of Self–Governance" pursuant to the ISDA, Title III—Tribal Self–Governance Demonstration Project. Indian Self–Determination and Education Assistance Act Amendments of 1988, Pub.L. No. 100–472, §§ 301–306, 102 Stat. 2285, 2296–98. The ISDA requires that every self-determination contract incorporate the terms of a model agreement, which is provided by 25 U.S.C. § § 450l(c). The compact at issue here incorporated all of the terms of this model agreement. The compact provided that the appellee and the Secretary would negotiate annual funding agreements, which would be treated as incorporated into the compact. Indirect costs were negotiated pursuant to Office of Management and Budget Circular A–87 as a predetermined fixed percentage of the base funding for the health programs.[2] The direct funding for the contract for those years was: $18,377,612 for 1994, $24,332,802 for 1995, and $24,681,697 for 1996. The negotiated rates to determine indirect costs were: 14.3% for fiscal year 1994; 17.1% for fiscal year 1995; and 12.2% for fiscal year 1996.

The compact required the Secretary to pay the full amount of funds negotiated in the annual funding agreements, subject only to the narrow exceptions provided by section 450j–1(b) and to any specific directives in applicable appropriations acts:

> Subject only to the appropriation of funds by the Congress of the United States, and to adjustments pursuant to [25 U.S.C. § 450j–1(b)] the Secretary shall provide to the Nation the total amount of funds specified in the Annual Funding Agreement incorporated by reference in Article V, Section 1.... [T]he use of any and all funds under this Compact shall be subject to specific directives or limitations as may be included in applicable appropriations acts.

(J.A. 73.) The Secretary did not pay the required amounts in full. The dispute here concerns the meaning of the section 450j–1(b) limitations, and whether they justified the Secretary's nonpayment.[3]

### III

On September 27, 1996, the appellee submitted a claim to the contracting officer under the Contract Disputes Act, 41 U.S.C. §§ 601–613, alleging that the Secretary had not paid the full indirect costs to which it was entitled for fiscal years 1994, 1995, and 1996. The appellee claimed that it was owed $1,769,148 for 1994, $2,794,595

---

**2.** Office of Management and Budget Circular A–87 provides, in pertinent part:

> A predetermined fixed rate for computing indirect costs applicable to a grant may be negotiated annually in situations where the cost experience and other pertinent facts available are deemed sufficient to enable the contracting parties to reach an informed judgment (1) as to the probable level of indirect costs in the grantee department during the period to be covered by the negotiated rate, and (2) that the amount allowable under the predetermined rate would not exceed actual indirect cost.

Principles for Determining Costs Applicable to Grants and Contracts With States, Local, and Federally Recognized Indian Tribal Governments, 46 Fed.Reg. 9548, 9550 (Jan. 28, 1981).

**3.** Because in the Secretary's view there were insufficient available appropriations to pay the tribes their full contract support costs, the Secretary implemented an allocation policy, whereby unpaid tribes were placed in a queue and paid from future appropriations according to the date of each tribe's individual request. Indian Health Service Circular No. 96–04 (Apr. 12, 1996).

for 1995, and $1,805,266 for 1996, for a total claim of $6,369,009. On October 31, 1997, in a final decision, the contracting officer denied the claim.

On January 27, 1998, the appellee appealed from the contracting officer's decision, alleging that the Secretary's failure to pay the full indirect costs constituted a breach of contract and a violation of the ISDA, and seeking damages in the amount of $7,040,358.52. (The reason for the increase in the claimed amount is unclear.)

On December 31, 1998, the Secretary moved to dismiss the appeal. The Secretary argued that under 25 U.S.C. § 450j–1(b), he was not obligated to pay full contract support costs. The Secretary urged that there was a lack of "available funds" under the 1994, 1995, and 1996, appropriations acts. The Secretary's sole argument in this respect was that there were specific recommendations of funding amounts for contract support costs in the appropriations committee reports, and that section 314 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub.L. No. 105–277, § 314, 112 Stat. 2681, 2681–288 (1998) ("section 314"), made those committee report recommendations retroactively binding. The Secretary argued that "Section 314 establishe[d] the 'total amounts' available for [contract support costs]" were the amounts recommended in committee reports, Secretary's Motion to Dismiss, at 8 (Dec. 31, 1998), and that "section 314 ha[d] the retroactive effect of extinguishing Cherokee's ... claims." *Cherokee I*, 99–2 B.C.A. (CCH) at 150,494, 1999 WL 440045.

On June 30, 1999, the Board granted summary judgment of entitlement to the claims in favor of the appellee. *Id.* at 150,495. The Board held that there was

no clear indication that Congress intended section 314 of the 1999 appropriations act to modify or repeal the Secretary's obligation to provide full indirect contract support costs under the ISDA or to authorize the Secretary to abrogate his past existing contractual obligations. The Board directed the parties to reach an agreement on quantum for the breach of contract within 60 days. *Id.*[4]

On March 27, 2000, the Secretary moved for reconsideration of the Board's decision. The Secretary argued that our court's decision in *Oglala Sioux*, which issued after the Board's initial decision, required reconsideration of the Board's grant of summary judgment. In *Oglala Sioux*, we held that language in the 1995 appropriations act funding the Bureau of Indian Affairs stating that "not to exceed $95,823,000 shall be for payments ... for contract support costs" constituted a statutory cap on appropriations that excused the agency from paying full contract support costs under the availability clause of section 450j–1(b). 194 F.3d at 1376, 1378. The Secretary admitted before the Board that, unlike *Oglala Sioux*, "[t]his case does not involve a statutory cap on appropriations, and, at first glance, the lump sum appropriations ... may appear more than adequate to make full payment." Appellee's Motion for Leave to Move for Reconsideration, at 10 (Mar. 27, 2000). However, the Secretary now argued that by virtue of section 450j–1(b), he was not required to pay full contract support costs because doing so would require a reduction of funds for programs serving other tribes. The Secretary argued that there was at least a dispute of material fact on this issue that precluded summary judgment.

---

4. The Secretary appealed the Board's decision to this court, but we dismissed the appeal, holding that the Board's order was not final. *Sec'y of Health & Human Servs. v. Cherokee Nation of Okla.*, No. 00–1056, 2000 WL 290337 (Fed.Cir. Feb. 25, 2000).

On March 21, 2001, the Board denied rehearing. *Cherokee II*, 01–1 B.C.A. (CCH) at 154,801, 2001 WL 283245. The Board held that, unlike *Oglala Sioux*, there were no statutory caps on available appropriations for contract support costs, and that earmarks in committee reports were not binding on the Secretary. The Board also held that the Secretary "ha[d] provided neither adequate nor convincing proof in this case that any actual reduction of funds for other tribes would be required to fully fund [the appellee's contract support costs]." *Id.* at 154,800. The Board, therefore, reaffirmed its grant of summary judgment for the appellee on the issue of entitlement.

On November 15, 2001, the Board accepted the parties' joint stipulation on quantum and ordered damages in favor of the appellee in the amount of $8,500,000.

The Secretary timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10). We review the grant of summary judgment without deference. *Oglala Sioux*, 194 F.3d at 1377.

## DISCUSSION

### I

■ The question is whether the Secretary breached his funding agreements with the appellee for the fiscal years 1994, 1995, and 1996, by failing to pay full indirect contract support costs. This issue does not come to us on a blank slate. Several fundamental principles of appropriations law, as enunciated by the Supreme Court, by this court, by our predecessor court, and by other circuits are relevant to this case. These decisions have relied on the opinions of the General Accounting Office ("GAO"), as expressed in *Principles of Federal Appropriations Law* ("*GAO Redbook*"), and on the opinions of the Comptroller General, both of whose opinions,

while not binding, are "expert opinion[s], which we should prudently consider." *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C.Cir.1984); *see also Lincoln v. Vigil*, 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (relying on *GAO Redbook* at 6–159); *Assoc. of Civilian Technicians v. Fed. Labor Relations Auth.*, 269 F.3d 1112, 1116 (D.C.Cir.2001).

■ The first principle is that, if there is a statutory restriction on available appropriations for a program, either in the relevant appropriations act or in a separate statute, the agency is not free to increase funding for that program beyond that limit. *Oglala Sioux*, 194 F.3d at 1376, 1378. In *Oglala Sioux* we found such a restriction in the appropriations act itself. *Id.* In *Sutton v. United States*, 256 U.S. 575, 56 Ct.Cl. 477, 41 S.Ct. 563, 65 L.Ed. 1099 (1921), the Supreme Court found that language in a separate statute imposed a statutory cap on appropriations when the separate statute provided that "no contract 'for any public improvement . . . shall bind the Government to pay a larger sum of money than the amount in the Treasury appointed for the specific purpose.'" *Id.* at 578, 41 S.Ct. 563.

■ The second principle is that Congress generally uses standard phrases to impose a statutory cap. *GAO Redbook* at 6–4 ("[C]ertain forms of appropriation language have become standard."). The most common language in appropriations acts provides that funds allocated to a specific program are "not to exceed" a particular amount. *See, e.g., Oglala Sioux*, 194 F.3d at 1376, 1378; *Nat'l Ass'n of Reg'l Councils v. Costle*, 564 F.2d 583, 587 (D.C.Cir. 1977) (interpreting "not to exceed" appropriations language as placing a statutory cap on appropriations); *Appropriations Restrictions Prohibition Clause*, 64 Comp. Gen. 263, 264 (1985) (interpreting "not to exceed $15,000" as "susceptible of but one

meaning which is that the [agency] may not expend more than $15,000"); *see also GAO Redbook* at 6–5 to 6–8 ("[T]he most effective way to establish a maximum (but not minimum) earmark is by the words 'not to exceed' or 'not more than.' ... These are all phrases with well-settled plain meanings.").

■■■ The third established principle of appropriations law is that in order for a statutory cap to be binding on an agency, it must be carried into the legislation itself; such a cap cannot be imposed by statements in committee reports or other legislative history. As the Supreme Court noted in *Lincoln*:

> a fundamental principle of appropriations law is that where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and *indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on the agency*.

508 U.S. at 192, 113 S.Ct. 2024 (emphasis added) (citations omitted). To be sure, legislative history can be used as an interpretive guide to determine whether language in an appropriations act constitutes a statutory cap. *United States v. Dickerson*, 310 U.S. 554, 561, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). However, legislative history itself is not binding on an agency and does not "ha[ve] the force of law, for the Constitution is quite explicit about the procedure that Congress must follow in legislating." *Am. Hosp. Ass'n v. Nat'l Labor Relations Bd.*, 499 U.S. 606, 616, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1990), *quoted in Lincoln*, 508 U.S. at 192, 113 S.Ct. 2024. Our predecessor court in *Blackhawk Heating & Plumbing Co. v. United States*, 224 Ct.Cl. 111, 622 F.2d 539 (1980) specifically held that statements in committee reports and at hearings expressing disapproval of the agency's reprogramming did not constitute statutory caps on available appropriations. *Id.* at 544–46.

■■■ The fourth principle is that when there is a lump-sum appropriation without a statutory cap, an agency is free to reprogram funds from that appropriation from one activity to another. The GAO defines "reprogramming [as] the utilization of funds in an appropriation account for purposes other than those contemplated at the time of appropriation. In other words, it is the shifting of funds from one object to another *within* an appropriation." *GAO Redbook* at 2–25 (emphasis in original). "The authority to reprogram is implicit in an agency's responsibility to manage its funds; no statutory authority is necessary." *Id.; see also LTV Aerospace Corp.*, 55 Comp. Gen. 307, 319 (1975). Hence, unless there is a specific "statutory cap" on the use of lump-sum appropriations, or a specific restriction in other legislation, an agency is not restricted in its ability to reprogram.

This view of the scope of the reprogramming authority was confirmed by the Supreme Court in *Lincoln*. 508 U.S. at 192, 113 S.Ct. 2024. In *Lincoln*, the Indian Health Service redirected funding for a program that had previously been funded out of its lump-sum appropriation. The tribe contended that the Indian Health Service was obligated to continue to fund the program from lump-sum appropriations in later years. The Court disagreed, holding that, because the appropriations legislation merely provided a lump-sum appropriation without further restriction, the agency was free to reprogram funds. *Id.* at 192 (citing *GAO Redbook* at 6–159). The Court based its conclusion on "a fundamental principle of appropriations law ... that where 'Congress merely appropri-

ates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions.'" *Id.* at 192 (*quoting LTV Aerospace Corp.*, 55 Comp. Gen. at 319). Our predecessor court also recognized this principle in *Blackhawk*, in which we stated:

> the budget estimates presented to the Congress, and on the bases of which a lump-sum appropriation is subsequently enacted, are not binding on the administrative officers unless those items (and their amounts) are carried into the language of the appropriations act itself, see 17 Comp. Gen. 147, 150 (1937), or ... there exists a statute that places a general and continuing restriction upon any agency's right to shift funds within an appropriation account.

622 F.2d at 547 n. 6.

■ The final relevant principle of appropriations law is that, in the absence of a statutory cap or other explicit statutory restriction, an agency is *required* to reprogram if doing so is necessary to meet debts or obligations. In other words, "[i]n some situations, the agency's discretion may rise to the level of a duty." *GAO Redbook* at 2–26. This was the holding of the court in *Blackhawk*. 622 F.2d at 553. In *Blackhawk*, the agency defended its failure to pay fully under the terms of a settlement agreement by pointing to a provision of the agreement that the agency's liability was "contingent upon the availability of appropriated funds from which payment in full can be made." *Id.* Because there was no statutory restriction on the reprogramming authority with respect to past due obligations, our predecessor court held that the agency was obligated to make the payments and was liable for breach of contract when it declined to do so. *Id.* at 553; *see also* H.R.Rep. No. 105–609 at 57 (1998) ("Without a ceiling on contract support, the Bureau [of Indian Affairs] could be required to reprogram from other tribal programs in the Operation of Indian Programs to fund 100 percent of tribal contract support costs.").[5]

## II

Against these principles, we consider the Secretary's core argument that he was excused from fulfilling his contract obligations in the present case by the availability clause of 25 U.S.C. § 450j–1(b). That clause provides that "[n]otwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations." 25 U.S.C. § 450j–1(b) (2000).

The Secretary's various arguments under this clause are confusing and contradictory, and depart from arguments the Secretary made before the Board and in similar litigation in the Ninth and Tenth circuits. Nonetheless, in nearly identical litigation in the Ninth and Tenth Circuits involving the same statutory language, the Secretary prevailed. *Cherokee Nation of Okla. v. Thompson*, 311 F.3d 1054, 1066 (10th Cir.2002); *Shoshone–Bannock Tribes of the Fort Hall Reservation v. Dep't of Health & Human Servs.*, 279 F.3d 660, 668 (9th Cir.2002). The Ninth and Tenth circuits held that the Secretary was excused by the availability clause of section 450j–1(b) from fulfilling his contractual obligation to pay full contract support costs.

---

**5.** We reject the government's attempt to distinguish *Blackhawk* on the basis that *Blackhawk* involved the interpretation of a standard procurement contract, rather than a contract under the ISDA. There is nothing in the ISDA to support the contention that the Secretary has wider latitude to breach his contracts with the Indian tribes than he has with other government contractors.

We find none of the Secretary's arguments persuasive, and disagree with the approaches of the Ninth and Tenth Circuit cases.[6]

We consider separately the Secretary's obligations with respect to "ongoing contracts" and "initial and expanded contracts." "Ongoing contracts" are contracts that continue from fiscal years before the relevant appropriations act, while "initial and expanded contracts" are those that begin during the fiscal year of the relevant appropriations act. *See* Indian Health Service Circular No. 96–04, at 10, 13, available at http://www.ihs.gov/publicinfo/publications/ihsmanual/Circulars/Circ96/9604.pdf.[7]

**A. Ongoing Contracts**

■ There is no argument that there was an explicit statutory cap in the appropriations acts for ongoing contracts. However, in various appropriations committee reports, the Senate Appropriations Committee and the House Appropriations Committee recommended particular funding levels for contract support costs for both ongoing and initial and expanded contracts. For example, the House Report on the 1996 appropriations act stated, "[t]he Committee recommends $153,040,000 for contract support." H.R.Rep. No. 104–173, at 97 (1995). The amount contemplated

for ongoing contracts can be deduced by deducting the amount recommended for initial and expanded contracts in this case, $7,500,000. *Id.* Thus, the total contemplated by the House Committee for ongoing contracts in 1996, was $145,540,000. As discussed above, the Supreme Court's decision in *Lincoln*, our predecessor court's decision in *Blackhawk*, and other cases establish that such committee report language as such is not binding on the Secretary. *Lincoln*, 508 U.S. at 192, 113 S.Ct. 2024; *Blackhawk*, 622 F.2d at 547 n. 6; *see also Am. Hosp. Ass'n*, 499 U.S. at 616, 111 S.Ct. 1539 (holding that statements in committee reports were not binding on the agency and do not "ha[ve] the force of law, for the Constitution is quite explicit about the procedure that Congress must follow in legislating").[8]

The Secretary accepts this principle, but argues that he had discretion to determine the amount of "available appropriations" for ongoing contracts and that this discretion was appropriately guided by the recommendations in committee reports. The Tenth Circuit agreed, holding:

> in accordance with the appropriation committee report recommendations, the [Secretary] allocated to area offices for tribal contract [support costs] $153,040,000 in 1996 and $160,660,000 in

---

**6.** Those cases involved the Shoshone–Bannock Tribe's operation of healthcare programs during fiscal year 1996, the Shoshone Paiute's operation of healthcare programs during fiscal years 1996 and 1997, and the Cherokee Nation's Tribes of the Duck Valley Reservation's operation of healthcare programs during fiscal year 1997. *Shoshone–Bannock*, 279 F.3d at 668; *Cherokee*, 311 F.3d at 1058 n. 4.

**7.** The status of the contracts at issue here is somewhat unclear. The parties dispute whether some of the programs the appellee operates were "ongoing" or "initial and expanded." (*Compare* Appellant's Br. at 18,

*with* Appellee's Br. at 21 n. 42.) Because we conclude that there was no statutory cap on appropriations for either type of program, we need not decide this issue.

**8.** Significantly, the ISDA, in one very limited respect, did make Committee Report language binding, stating that "[t]he amount of funds required by subsection (a) of this section ... (2) shall not be reduced by the Secretary in subsequent years except pursuant to ... (B) a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution." 25 U.S.C. § 450j–1(b) (2000).

1997.... [W]hile the Tribes correctly argue that the earmark recommendations of a committee are not typically legally binding, the [Secretary] is likewise not obligated to completely ignore them. Nothing suggests that the [Secretary] awarded the amount it did for ongoing program [contract support costs] because it felt *legally* obligated to do so because of the committee report recommendations, as opposed to *making that allocation as an exercise of the limited discretion inevitably vested in it.* In sum, we agree with the district court that funding for the Tribes' ongoing [contract support costs] was subject to the availability of appropriations from Congress, and there were insufficient appropriations to fully pay those [contract support costs].

*Cherokee,* 311 F.3d at 1062–63 (first emphasis in original) (second emphasis added) (internal citations omitted).[9]

We cannot agree that the Secretary had discretion to refuse to reprogram to meet his contractual obligations. As we have discussed above, it is well recognized that if the Secretary has the authority to reprogram and there are funds available in a lump-sum appropriation, there are "available funds." Our predecessor court in *Blackhawk* rejected the Secretary's contention to the contrary. 622 F.2d at 547. In *Blackhawk,* the government refused to reprogram to meet its obligations under a settlement agreement, because members of Congress had expressed their disapproval of the reprogramming procedure in committee reports and during hearings. *Id.* at 544–46. Our predecessor court held that statements of Congress that were not enacted into legislation, "can have no bearing upon the parties' rights and obligations under the settlement agreement." *Id.* at 552.

Indeed, allowing the Secretary such discretion would be directly contrary to the purpose of the 1988 Amendments. The primary purpose of section 205 was to remedy "[t]he consistent failure of federal agencies to fully fund tribal indirect costs." S.Rep. No. 100–274, at 8–9. Under the Secretary's approach, section 205 of the 1988 amendments would be rendered a nullity. *See Holloway v. United States,* 526 U.S. 1, 9, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999) (rejecting a statutory construction that "would exclude from the coverage of the statute most of the conduct that Congress obviously intended to prohibit").[10]

In short, non-binding recommendations of Congress do not excuse the Secretary from fulfilling his duty under the contracts at issue here to pay full contract support costs. The Secretary did not have the discretion to breach his contracts with the appellee.[11]

---

9. In the Ninth Circuit, the parties agreed that only the transitional costs of new and expanded contracts were at issue. *Shoshone–Bannock,* 279 F.3d at 666. Thus, funding for ongoing contracts was not addressed in that case.

10. Significantly, in *Ramah Navajo School Board, Inc. v. Babbitt,* the District of Columbia Circuit also rejected the Secretary's argument that he had "nearly limitless discretion" under the ISDA to pay less than the full amount of contract support costs that were made available in the relevant appropriations acts. 87 F.3d 1338, 1345 (D.C.Cir.1996). Af-

ter analyzing the text and legislative history of the ISDA, the court in *Ramah Navajo* held that "Congress left the Secretary with as little discretion as feasible in the allocation of [contract support costs]" and that "there is overwhelming evidence that Congress intended the ISDA to limit the Secretary's discretion in funding matters." *Id.* at 1344, 1347.

11. This holding with respect to the Secretary's lack of discretion applies to initial and expanded contracts as well as ongoing contracts.

## B. Initial and Expanded Contracts

█ The Secretary appears to argue, however, that even if there were available funds with regard to ongoing contracts, there was a statutory cap on "initial or expanded contracts," which limited the amount of available funds for initial and expanded contracts and excused the Secretary's duty to pay full contract support costs for those contracts. The appropriations acts at issue here all grant a lump-sum appropriation to the Indian Health Service and do not include "not to exceed" language. But these acts do include a provision stating that, "of the funds provided, $7,500,000 shall remain available until expended, for the Indian Self Determination Fund, which shall be available for the transitional costs of initial or expanded tribal contracts." Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. 104–134, 110 Stat. 1321, 1321–189 (1996); *see also* Department of the Interior and Related Agencies Appropriations Act, 1995, Pub.L. No. 103–332, 108 Stat. 2499, 2528 (1994); Department of the Interior and Related Agencies Appropriations Act, 1994, Pub.L. No. 103–138, 107 Stat. 1379, 1408 (1993).[12] Initially, it appeared that the Secretary had abandoned the argument that the "shall remain available" language constituted a statutory cap.

In his brief, the Secretary conceded that "[u]nlike the [Bureau of Indian Affairs], [the Indian Health Service's] annual appropriation acts did not place such a cap." (Appellant's Br. at 33.) The Secretary made the further concession that "[i]n order to be a statutory 'cap,' the language would have to read that 'not to exceed' $7.5 million was available for new [contract support costs], rather than that $7.5 million 'shall remain available.'" (Appellant's Br. at 33, n. 17 (citing *Ramah Navajo Sch. Bd.* 87 F.3d at 1342)). At oral argument, the Secretary presented directly inconsistent theories, at one and the same time reiterating the concessions in his brief,[13] and then arguing that there was an explicit statutory cap.[14] We treat the Secretary as making this argument, but conclude that the appropriations legislation did not impose a statutory cap as to initial and expanded contracts.

In the Ninth and Tenth Circuits, the Secretary argued that the "shall remain available" language was ambiguous, and that committee reports should be consulted to resolve the ambiguity. Those courts agreed. In *Shoshone–Bannock*, the court found, "[t]he appropriation language is arguably ambiguous. The language, $7.5 million 'shall remain available until expended' is not an unambiguous cap, as was

---

**12.** The parties apparently do not dispute that this $7.5 million was spent during the relevant fiscal years and was insufficient to pay all contract support costs.

**13.** The following exchange occurred at oral argument:

THE COURT: Do I understand that the [Secretary] concedes that there's no legal restriction on [the Secretary] using reprogramming authority to spend more funds for the support costs than it elected to do?

COUNSEL FOR THE SECRETARY: Well, our position is that under the statutory language as it existed, there's, in the appropriations language, there was no statutory cap as that term of art is used.

**14.** The following exchange occurred at oral argument:

THE COURT: Are you arguing that there's a cap or not a cap? I'm confused. I thought you began the argument by saying there wasn't a cap?

COUNSEL FOR THE SECRETARY: I'm sorry that I confused the court because our position is that what in effect happened was that Congress clarified it and intended it to be a cap. THE COURT: Is there a cap or isn't there a cap? Is there a statutory cap? COUNSEL FOR THE SECRETARY: Yes.

the 'of which not to exceed' language of [the 1995 appropriations provision at issue in *Oglala Sioux* ]." 279 F.3d at 666. The court held, however, that the committee report of the House Appropriations Committee helped to resolve this ambiguity in favor of finding a limitation. The committee report stated, "[t]he Committee has provided $7,500,000 for the Indian Self–Determination Fund. These funds are to be used for new and expanded contracts." H.R.Rep. No. 104–173, at 97. The court held that "[t]his Committee Report language lends itself to the ... reading[ ] that only $7.5 million is available." *Shoshone–Bannock*, 279 F.3d at 666. In *Cherokee*, the Tenth Circuit agreed with the Ninth Circuit's reasoning in *Shoshone–Bannock* and with the Ninth Circuit's conclusion that there was a $7.5 million cap on contract support costs for new and expanded contracts. 311 F.3d at 1063–64. In *Cherokee*, the Tenth Circuit held, "to the extent there is any indicia of Congressional intent ... in the appropriations committee report ... it supports the conclusion that Congress intended the $7.5 million to be the maximum [for new and expanded contracts]." *Id.* at 1065 n. 10.

We conclude that the Ninth and Tenth Circuit decisions were incorrect in this respect. We recognize that where appropriations acts are ambiguous, legislative history can be relied upon to resolve that ambiguity. *See Dickerson*, 310 U.S. at 561, 60 S.Ct. 1034. However, the "shall remain available" language was not ambiguous. Such language is commonly understood as a carryover provision, not a statutory cap. The phrase "shall remain available" is a term of art in appropriations legislation that our sister circuits have consistently interpreted, not as a statutory cap on funding to a particular source, but as an authorization of "carryover authority," indicating that unexpended funds "shall remain available" for the same purpose during the succeeding fiscal year. *See, e.g., Mass. Dep't of Educ. v. United States Dep't of Educ.*, 837 F.2d 536, 538–39 (1st Cir.1988) (interpreting "shall remain available" language in 20 U.S.C. § 1225(b)(1) as preserving unexpended funds to state agencies for obligation and expenditure during the succeeding fiscal year); *Wilson v. Watt*, 703 F.2d 395, 400 (9th Cir.1983) (holding that because the relevant appropriations act provided that unexpended funds "shall remain available," plaintiffs could demonstrate that Congress intended unexpended funds to be used for the same purpose in the succeeding fiscal year); *Nat'l Ass'n of Reg'l Councils*, 564 F.2d at 589 n. 12 (distinguishing "shall remain available" language from "not to exceed" language and finding that the former does not impose a statutory cap, but is typically used to "carryover" unexpended funds to the succeeding fiscal year). In the present case, there is no indication that the "shall remain available" language constituted anything other than a typical "carryover" provision. It certainly did not constitute a statutory cap excusing the Secretary from fulfilling his obligations under the availability clause of section 450j–1(b).[15]

## C. Section 314

The Secretary additionally argues that section 314 of the 1999 appropriations act leads to a different result, both with respect to ongoing and initial contracts.

---

15. Because we conclude that the "shall remain available" language was not ambiguous, we need not address what role, if any, the Indian canon of statutory construction, *Chickasaw Nation v. United States*, 534 U.S. 84, 93– 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001), or the *Chevron* doctrine, *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), would have here.

Section 314 provided, in relevant part, as follows:

> Notwithstanding any other provision of law, amounts appropriated to or earmarked in committee reports for the Bureau of Indian Affairs and the Indian Health Service by Public Laws 103–138, 103–332, 104–134, 104–208 and 105–83 for payments to tribes and tribal organizations for contract support costs ... are the total amounts available for fiscal years 1994 through 1998 for such purposes....

Pub.L. No. 105–277, 112 Stat. at 2681–288. In view of the well-established presumption against retroactivity, the Secretary does not directly argue that section 314 retroactively limits the amount of funds available in the earlier years.[16]

Nor could the Secretary so argue. Our predecessor court's decision in *Blackhawk* is directly on point. There, the court concluded that a statute enacted by Congress limiting the amount of settlements could not abrogate the contractor's right to payments that were due before the passage of the statute. *Blackhawk*, 622 F.2d at 552; *see also N.Y. Airways, Inc. v. United States*, 177 Ct.Cl. 800, 369 F.2d 743, 750 (1966) ("[A] pure limitation on an appropriation bill does not have the effect of either repealing or even suspending an existing statutory obligation.") (quoting *Gibney v. United States*, 114 Ct.Cl. 38, 50–51 (1949)). In the present case, the appellee's right to the contract support costs vested long before the passage of the 1999 appropriations

act. The relevant appropriations acts provided that "funds made available to tribes and tribal organizations through contracts ... shall be deemed to be obligated at the time of the grant or contract award and thereafter shall remain available to the tribe or tribal organization without fiscal year limitation." Pub.L. No. 103–138, 107 Stat. at 1408; *see also* Pub.L. No. 103–332, 108 Stat. at 2528; Pub.L. No. 104–134, 110 Stat. at 1321–189.[17]

■ The Secretary, nonetheless, argues that section 314 acts as an interpretive guide that clarifies Congress's intent to limit available appropriations under the ISDA to amounts earmarked in committee reports. (Appellant's Br. at 44, 51.) Again, the Ninth and Tenth Circuits agreed with this argument. In *Cherokee*, the Tenth Circuit held as follows:

> The government argues we need not consider § 314 as a retroactive law; rather, it simply clarifies what Congress meant in enacting the 1996 and 1997 Appropriations Acts.... Whether we view [section 314] as a retroactive law, or as merely a clarification of the prior Appropriations Acts, Congress could not have been clearer as to its intent that the Act have a retroactive effect.... We therefore agree with the district court that § 314 supports its conclusion that Congress intended to make available for [contract support costs] for new and expanded contracts in fiscal years 1996 and 1997 *only* $7.5 million. Further, it indicated that the earmarked amounts in

---

**16.** *See Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 309, 311, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994); *Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 716, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Thorpe v. Hous. Auth. of Durham*, 393 U.S. 268, 282, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969).

**17.** However, *Blackhawk* holds that a restriction in later appropriations legislation is ef-

fective to eliminate the obligation to make a payment due after the passage of the restriction. 622 F.2d at 552. Here, the payments were due before the enactment of section 314. Thus, we need not decide whether that aspect of *Blackhawk* survives the decision in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

the committee reports for ongoing [contract support costs] were intended to be legally binding.

311 F.3d at 1065 (emphasis in original); *see also Shoshone–Bannock,* 279 F.3d at 666. We again disagree.

■■■ There appears to be some confusion as to the role of later statutes in interpreting earlier ones.[18] We need not in this case broadly address or resolve this conflict, because there appears to be general agreement that a later statute cannot be read as clarifying the meaning of an earlier statute where the earlier statute is unambiguous and the later statute is ambiguous. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980) ("[T]he views of subsequent Congresses cannot override the unmistakable intent of the enacting one...."); *Piamba Cortes,* 177 F.3d at 1283–84; *Beverly Cmty. Hosp. Ass'n,* 132 F.3d at 1266. As we have already discussed, in the present case the relevant appropriations acts were not ambiguous and were not in need of clarification. They imposed no cap on available appropriations, either as to ongoing contracts, or as to initial and expanded contracts.

We also agree with the Board that section 314 was not unambiguously in-tended to clarify the meaning of the prior appropriations acts. As the Board found, section 314 is easily susceptible to an interpretation that Congress was merely prohibiting the *future* obligation of unspent appropriated funds, rather than clarifying that the earlier statutes imposed a statutory cap. *See Cherokee I,* 99–2 B.C.A. (CCH) at 150,494, 1999 WL 440045. Under these circumstances, section 314 cannot work a supposed clarification of the earlier appropriations acts.

■■■ The Secretary offers two final arguments with respect to the effect of section 314. The Secretary argues that the claim for damages is moot, because the case was filed after the close of the relevant fiscal years, and section 314 barred payment after the close of the fiscal years. The issue in this case under the availability clause, however, is whether funds *were* available for the Secretary to meet his contract obligations, not whether those funds *remain available* now. The courts have long entertained breach of contract claims against the government filed after the relevant fiscal years have expired. In such a case, damages are awarded from the judgment fund created by 31 U.S.C. § 1304. *Lee v. United States,* 129 F.3d 1482, 1484 (Fed.Cir.1997).

---

**18.** *Compare O'Gilvie v. United States,* 519 U.S. 79, 90, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996) ("[T]he view of a later Congress cannot control the interpretation of an earlier enacted statute."), *and United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."), *with Bell v. New Jersey,* 461 U.S. 773, 784, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983) ("Of course, the view of a later Congress does not establish definitely the meaning of an earlier enactment, but it does have persuasive value."); *Red Lion Broad. Co. v. Fed. Communications Comm'n,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1968) ("Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."); *Piamba Cortes v. Am. Airlines, Inc.,* 177 F.3d 1272, 1283–84 (11th Cir.1999) (holding that in some circumstances a statute can be read to clarify an earlier ambiguous statute, such that "concerns about retroactive application are not implicated"), *and Beverly Cmty. Hosp. Ass'n v. Belshe,* 132 F.3d 1259, 1264–65 (9th Cir.1997) ("[C]ongressional legislation that thus expresses the intent of an earlier statute must be accorded great weight" in interpreting the earlier statute, even where the later statute's "retroactive application would pose a series of potential constitutional problems.").

Somewhat inconsistently with his concession that section 314 is not retroactive, the Secretary argues that section 314 retroactively extinguished appellee's right to full contract support costs and thus barred an award of damages from the judgment fund. In *Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), the Supreme Court held that "funds may be paid out [of the judgment fund] only on the basis of a judgment based on a substantive right to compensation based on the express terms of a specific statute." *Id.* at 432. The Secretary urges that in light of section 314, there is no longer a "right to those payments under the terms of a specific statute within the meaning of *Richmond.*" (Appellant's Br. at 54.) We have already concluded, however, that section 314 did not impose a retroactive cap on available appropriations and did not extinguish the appellee's substantive right to full contract support costs under the express terms of the ISDA. Damages for breach of contract may be awarded out of the Judgment Fund when payment is not otherwise provided for. *Lee*, 129 F.3d at 1484.

In summary, because there were no statutory caps on available appropriations, the Secretary was not excused from meeting his contractual obligations by the availability clause of section 450j–1(b).

### III

The Secretary argues alternatively that he was excused from performing his contract obligations by the clause in section 450j–1(b) providing that, "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter." 25 U.S.C. § 450j–1(b) (2000). The parties disagree as to the meaning of this clause. The tribe urges that the only funds restricted by this provision are those funds specifically appropriated by Congress for other tribal purposes. (Appellee's Br. at 51.) The Secretary argues that the restriction applies as well to funds that the Secretary in his discretion has allocated to other tribal programs. (Appellant's Br. at 36–38.) We need not resolve this dispute, for even adopting the Secretary's construction, there are substantial funds that were not so restricted.

After oral argument in this case, we twice ordered supplemental briefing, in order to seek clarification from the Secretary as to how much of the lump-sum appropriations were obligated to programs serving other tribes for purposes of section 450j–1(b). The Secretary's filings were unresponsive. We need not decide, however, precisely how much money was obligated to "funding for programs, projects, or activities serving [another] tribe" and, therefore, unavailable for contract support costs, because the Secretary identified two categories of funds that clearly do not fall under this restriction: moneys reserved for "inherently federal functions" and moneys that were left-over and unexpended at the end of the relevant fiscal years. These amounts were more than sufficient during the relevant fiscal years for the Secretary to pay full contract support costs to the tribe, and the Secretary would not, therefore, have been forced to reduce funding for programs serving other tribes in order to meet his obligations.

In fiscal years 1994, 1995, and 1996, Congress's total lump-sum appropriations for Indian Health Services were $1,645,877,000, Pub.L. No. 103–138, 107 Stat. at 1408, $1,713,052,000, Pub.L. No. 103–332, 108 Stat. at 2528, and $1,747,842,000, Pub.L. No. 104–134, 110 Stat. at 1321–189. Out of these lump-sum

appropriations, Congress specifically obligated particular amounts to various programs in the appropriations acts themselves, such that the Secretary admits that the remaining available appropriations were $1,288,529,000 for 1994, $1,337,042,218 for 1995, and $1,375,245,000 for 1996. (Appellant's Revised Supplemental Br. at 7.) The Secretary admits that he retained the following amounts for "inherently federal functions": $25,522,460 in 1994, $29,613,574 in 1995, and $35,989,621 in 1996. (*Id.* at 8.) These amounts did not constitute "funding for programs, projects, or activities serving a tribe" under section 450j–1(b). The ISDA is clear that contract support costs "shall not be reduced by the Secretary to pay for Federal functions, including, but not limited to, Federal pay costs, Federal employee retirement benefits, automated data processing, contract technical assistance or contract monitoring." 25 U.S.C. § 450j–1(b)(3) (2000). The Act also provides that contract support costs "shall not be reduced to make funding available for contract monitoring or administration by the Secretary." *Id.* § 450j–1(b)(1). The statute thus makes it quite clear that funds devoted by the Secretary to "inherently federal functions" were not unavailable for contract support costs. Hence, the Secretary was obligated to reprogram these funds in order to pay contract support costs.

The Secretary also admits that "there were unobligated balances ... during each fiscal year ... ranging between $1.2 and $6.8 million." (Appellant's Supplemental Br. at 4.) [19] These leftover and unexpended appropriations were also available to the Secretary to meet his contractual obli-

gations and did not constitute funding for programs serving other tribes.

Taken together, the appropriations reserved for "inherently federal functions" and the left-over appropriations were more than sufficient to pay the tribe its full contract support costs. There is, therefore, no need for a remand, as the Secretary urges, to determine what other funds may have been available for the Secretary to meet his contract obligations. The funds reserved for "inherently federal functions" and the left-over appropriations were not funds devoted to programs serving other tribes, and the Secretary could have drawn from those funds to meet his obligations without reducing funding for programs serving other tribes.

Thus, we hold that the Board was correct in holding that the Secretary was not excused from meeting his contractual obligation to pay the appellee its full contract support costs by the clause in section 450j–1(b) providing that "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter."

## IV

 Finally, the Secretary argues that the Board's award of damages to the appellee violated the Appropriations Clause of the Constitution. This argument is untenable.

 The Appropriations Clause provides, in pertinent part, as follows: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law...." U.S. Const. art. I, § 9, cl. 7. The Secretary repeats his arguments that no appropriations were made

---

**19.** The appellee claims that the left-over unobligated amounts were substantially larger

(Appellee's Br. at 17.)

for contract support costs in excess of those recommended in the committee reports, and that, therefore, the award of damages in this case violates the Appropriations Clause. We have already rejected these arguments. It is true that if an agency, "in the absence of statutory authority, make[s] promises that impose an obligation on the federal Treasury, [it] exceed[s][its] constitutional authority and abrogate[s] Congress' authority under the Appropriations Clause." *Schism v. United States,* 316 F.3d 1259, 1288 (Fed.Cir.2002) (*en banc* ), *cert. denied,* — U.S. —, 123 S.Ct. 2246, 156 L.Ed.2d 125 (2003). However, in this case, there was statutory authority for the contract support costs. The Secretary was authorized by Congress to make a contract with the appellee and was required to pay the appellee full contract support costs under the ISDA. Congress then granted the Secretary a lump-sum appropriation with no statutory caps imposed, out of which he was entitled to draw money to meet his contractual obligations. There was, therefore, no violation of the Appropriations Clause.

## CONCLUSION

For the foregoing reasons, we hold that the Secretary was obligated to pay the appellee its full support costs and that the Secretary's failure to do so was a breach of contract. Accordingly, the judgment of the Interior Board of Contract Appeals is

*AFFIRMED.*

## COSTS

No costs.